SARAH SCHIFFRES, PETITIONER--APPELLANT, v. KITTA-
TINNY LODGE, INC., RESPONDENT-RESPONDENT.

STANLEY S. SCHIFFRES, PETITIONER-APPELLANT, v. KIT-
TATINNY LODGE, INC., RESPONDENT-RESPONDENT.

Argued November 20, 1962—Decided January 21, 1963.

140

*Mr. Mortimer Wald* for petitioners-appellants Sarah Schiffres and Stanley S. Schiffres.

*Mr. H. Curtis Meanor* for respondent-respondent Kittatinny Lodge, Inc. (*Messrs. Lamb, Langan & Blake,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. This is a workmen's compensation case. On July 13, 1951 Stanley S. Schiffres suffered a compensable heart attack. The resulting permanent disability was adjudged to be 37.5% of total and such an award was made on January 13, 1953. On January 3, 1955, about three and one-half years after the first incident, a second heart attack occurred. Within a day or so he had a stroke which produced a right side hemiplegia. Thereafter, on January 13, 1956 he filed a petition for additional compensation alleging an increase in disability and that it was chargeable to the 1951 heart attack. On August 29, 1958, before the case was reached for hearing, Schiffres died. Another petition was then filed seeking death benefits for his widow and minor daughter on the theory that the death was caused by the 1951 compensable incident. The Deputy Director awarded compensation for both the second heart attack and the death. The County Court reversed the judgment, whereupon an appeal was taken to the Appellate Division. We certified it on our own motion before argument there.

In 1951 and prior thereto, Schiffres was a school teacher in the New York City public school system. He taught social studies at John Adams High School in Ozone Park, Queens, 18–20 miles from his home in lower Manhattan. In the summer he was director of performing arts at respondent's camp in Layton, New Jersey. In addition, during the winter he acted as metropolitan area representative for the camp, soliciting campers for the ensuing summer on a commission basis, and handling many of the managerial details associated with the operation of the lodge.

On July 13, 1951 Schiffres was 40 years of age. On that day while engaged in his regular duties at the camp, he moved a heavy set of stage steps into place and while doing so, suffered a coronary occlusion. The closure and resulting infarction took place in the anterior wall of the left ventricle of the heart. He was hospitalized until August 19, 1951, and after a short stay at his sister's home, returned to his residence around the end of August. He resumed his school teaching post on November 19 after his sick leave expired.

The great weight of the evidence shows that prior to the occlusion Schiffres had an underlying arteriosclerotic cardiovascular disease. As one of his doctors put it:

"He had coronary sclerosis, I feel prematurely, which accounted for the July 1951 acute anterior coronary infarction. At that particular time he could have been about 40 years of age, which is somewhat young for this condition, but coronary sclerosis has been determined in individuals of that age who do get coronary insults every day. There is no question in my mind that the coronaries were involved at that time * * *."

No one suggests that the coronary sclerosis was originated by the July 1951 work incident. When the occlusion occurred, blood could not pass through and beyond the blocked vessel. The deprivation of blood and oxygen caused necrosis beyond that point but the closure not being of such a vital artery as to produce Schiffres' death, nature began to establish collateral circulation to take the place of the closed vessel.

Thereafter in the course of time, scar tissue formed at the site of the necrosis and, of course, the vessel no longer served any useful function in the blood circulatory system. As the collateral circulation began to establish itself, Schiffres improved and the improvement continued as the heart adapted itself to the altered circulation. By November he was able to return to teaching.

Resumption of teaching did not mean that no permanent incapacity had flowed from his coronary attack. The medical proof makes plain that then and at the hearing in January 1953, the occlusion had left him with some permanent impairment of cardiac reserve. The Deputy Director found its extent to represent 37.5% of total permanent disability. The finding meant that the compensable incident, acting on the underlying sclerosis so as to cause or contribute to the occlusion, had imposed on Schiffres an incapacity of that degree, which disability he was going to have for the rest of his life. The permanently lowered cardiac reserve signified also that he would have to adjust his life and his activities so as to live within the limit of physical capacity remaining with him. The award of the statutory portion of his wages for the period measured by 37.5% of total permanent disability represented the compensation provided under the Workmen's Compensation Act for the loss of that percentage of his physical capacity, and for the limitations, restrictions and discomforts that were to be its concomitants for the remainder of his life.

Dr. Harry E. Kroin who attended Schiffres from July 31, 1951 down to the time of his death, advised him that he would have to live a controlled life with definitely restricted physical activities. Upon the resumption of teaching, the doctor told Schiffres that he should limit his activity to the minimum necessary to perform the usual duties of a teacher. The record shows that at the school provision was made for the delivery of his lectures while seated and for a minimum of standing during classes. Classrooms on the first floor were provided and outside activities normally connected with the teaching occupation were curtailed.

Dr. Kroin advised moving nearer to the school. This was not done. Except for a short period after returning to teaching and until the second coronary occlusion occurred in January 1955, more than three years later, Schiffres took a bus from his house to the subway, rode the subway to the proper station, walked up two flights of steps to the street level, and then took another bus to the school. But he said the twice-a-day, 18–20 mile trip was engaged in with care and restraint upon expenditure of physical exertion.

It appears also that Schiffres continued to act as area representative of the camp and sought to recruit campers for the ensuing summer season. The extent to which this was done in the years between the first and second occlusions is not clear from the record. Since his social activities were restricted according to the testimony, presumably there was also some curtailment of the camp-related efforts. The proof disclosed further that he and his wife were employed at the camp every summer until his death. In the summers between the first and second occlusions, his work was managerial and office detail, requiring little physical effort.

After the second attack and stroke in 1955, he returned to teaching in March 1956, driving himself to school most of the time in a specially adapted automobile. Although his hemiplegia, and the physical limitations it imposed, even after some rehabilitation, must have sharply restricted his capacity for exertion, he continued to teach to the best of his ability to the end of the 1958 school session. He and his wife were again employed at the camp in the summers of 1956, 1957 and 1958. The 1958 camp season ended on August 26 and he returned home. The next two days were spent preparing to return to his regular teaching assignment. He died in bed during the night of August 28.

After Dr. Kroin began to care for Schiffres on July 31, 1951 there were periodic office and home visits, sometimes for advice and treatment for complaints of pain and fatigue, sometimes for checkup and electrocardiograms. The doctor gave him medication when required. The electrocardiograms

showed the healed myocardial infarct in the anterior wall of the left ventricle; its condition was static. The heart rhythm was regular. Schiffres was told that the occasional pain was to be expected and to be judicious about overexertion. Plainly, the chest "jabs" as he described them were an incident of the permanent disability stemming from the original occlusion.

On January 2, 1955 Schiffres attended a camp reunion at a hotel in New York City. The next day he attended his usual school classes. That evening he went to bed early and suffered the second heart attack. He was hospitalized immediately and shortly thereafter had the cerebral hemorrhage of which mention has already been made. In connection with the stroke, it may be noted that about a year earlier on January 5, 1954 he had a cerebral vasospasm, possibly of the left lenticulostriate artery. For about three weeks prior to that date he had experienced numbness and weakness three times a day, especially in the right elbow and hand, with a sensation of swelling in the hand. On January 5, 1954 he had similar sensations of numbness and tingling in the right side of the face with difficulty of articulation and thickness of speech which lasted about 10 minutes. Dr. Kroin "couldn't state definitely" the reason for this cerebral spasm but said statistical evidence shows that "those things" do happen after myocardial infarcts. A neurological and psychiatric specialist who examined Schiffres in February 1957 and appeared for the petitioner at the hearing on the case now before the court, testified that the cerebral spasm had no relation "whatsoever" to the 1951 coronary infarction. In any event, with respect to the cerebral arteries, the overwhelming weight of the medical evidence demonstrates that prior to the 1951 heart attack Schiffres had arteriosclerosis of the cerebral as well as of the coronary arteries.

The second coronary attack of January 3, 1955 was again a myocardial infarct but this time the closure was in a different and opposite part of the heart. As revealed by the electrocardiograms, it occurred in a posterior coronary artery.

The crucial issue in the case is the causal relationship, if any, between the 1951 work-connected coronary occlusion in the anterior wall of the left ventricle and this January 1955 posterior wall occlusion. The final diagnosis in October 1955 on discharge from the Veterans Administration hospital was: "arteriosclerotic heart disease with acute myocardial infarction due to coronary thrombosis; cerebral thrombosis due to arteriosclerosis with right hemiplegia and aphasia * * *." We need not be concerned with the causal connection between the 1955 infarction and the stroke which followed closely after it. There seems to be little dispute among the treating and examining physicians on both sides of the case that there was a probable causal relation between them, and in our view the conclusion of such relation must be accepted. There is, however, a sharp and irreconcilable conflict in the medical evidence as to whether the first coronary attack was causally responsible for the second.

There was substantial agreement among most of the physicians that Schiffres had arteriosclerosis, perhaps generalized, but at least of the coronary and cerebral arteries prior to July 13, 1951. The doubt expressed by two doctors in the 1953 hearing we do not find persuasive. Likewise, there was no serious dispute among them that arteriosclerosis is a disease generally progressive in nature. And none of them suggested that the work incident of 1951 caused or accelerated the condition.

The opinions of the medical witnesses for the contending parties are clear in their collision. Petitioners' doctors say the first coronary occlusion impaired the blood circulation in the area of the infarct and that it could not be fully compensated for by the establishment of collateral circulation. This "compromised" circulation imposed a greater burden on the heart and when the second coronary insult occurred, as a matter of course the first work-induced occlusion must be regarded as the causative agent. Their theory is that once a person has sustained a myocardial infarction "it is more likely that he will suffer a second and then go on and suffer a

third myocardial infarction * * *. Therefore, the second myocardial infarction was definitely related to the first." In substance the position is that whenever a coronary infarction occurs, no matter what produces it, or where in the myocardium it is located, or what causes it, or what the degree of involvement, any subsequent infarction, regardless of the manner of production or whether the closure comes from embolus, thrombus, or coronary insufficiency, or the circumstances under which it takes place, must be considered as causally related to the first infarction. In other words, irrespective of the number of subsequent infarctions, however distant in time from the employment effort which caused or contributed to the first attack, the later ones, even a fatal one, must be treated conclusively as progressive emanations of the first attack. Acceptance of such a thesis would make payment of compensation automatic for increased disability or for death resulting from any subsequent infarction. The first compensation award for a coronary occlusion would be *res judicata* of the employer's liability for further payments simply upon proof of a subsequent myocardial infarction. Such a startling principle cannot be utilized in the administration of the Workmen's Compensation Act as a basis for an award unless it represents uncontrovertible medical fact. The record here does not support any such conclusion.

## I.

A workman who sustains a work-connected accidental injury is entitled to compensation for any resulting percentage of partial permanent disability. When such an award is made, the natural presumption is that it fully compensates him within the statutory limits for the permanent incapacity and the symptoms and physical weakness which are representative of such incapacity. In the case of a work-connected coronary occlusion which leaves a substantial percentage of permanent disability, such as we have here, it must be assumed that disabling symptoms, *i. e.*, pain and limited capacity for exertion, were present at the time of the

hearing, that they will continue in the future, and that the award has compensated the workman in full for a disability of the quality and quantity shown. The allowance made is *res judicata* and binds both employer and employee for all time subject only to *N. J. S. A.* 34:15–27 which authorizes an application by the employer for review and reduction thereof if the disability has diminished, or by the employee within two years after the last payment of benefits, for additional compensation if his incapacity increases.

The nature and significance of an original permanent disability award was the subject of comment in *Post Printing & Publishing Co. v. Erickson,* 94 *Colo.* 382, 30 *P. 2d* 327 (*Sup. Ct.* 1934). There it appeared that Erickson had sustained a knee injury for which he was granted workmen's compensation. Later, after returning to work, he fell on a snowy sidewalk and fractured the ankle of the same leg. Further compensation was sought on the theory that the second accident and disability was caused or contributed to by the weak knee. The claim was rejected, the court saying:

"It is true that the evidence tends to show that the knee [has] been weakened by the original injury. Nothing in the record indicates, however, that the compensation originally awarded did not fully indemnify the claimant for all direct loss, including the weakness resulting from the first accident. Undoubtedly, any natural development of an industrial injury, uninfluenced by an independent intervening cause, should be attributed to such injury as part of the loss to be compensated. Indeed, our statute (*C. L.* § 4468 *et seq.*) confers ample power on the Industrial Commission to reopen a case in its sound discretion for a supplemental hearing whenever any such development becomes apparent. That is different from this case. Upon the happening of a later accident like the one involved here, due to an efficient intervening cause, and not arising out of or in the course of the employment, the law does not contemplate that the original compensation shall be increased merely because the later accident might or would not have happened if the employee had retained all his former physical powers. It is presumptively for the loss of these that he was awarded the original compensation. * * *" 30 *P. 2d,* at *p.* 328.

When an employee seeks additional compensation under *N. J. S. A.* 34:15–27, alleging increased disability,

he has the burden of proving by the preponderance of the evidence not only the fact of increase but also that it is causally related to the original accident and resulting injury. *Yeomans v. Jersey City*, 27 *N. J.* 496, 508 (1958); *Giacchi v. Richmond Brothers Co.*, 11 *N. J. Super.* 76, 78 (*App. Div.* 1951), opinion adhered to, 12 *N. J. Super.* 308 (*App. Div.* 1951).

## II.

In January 1953 when Schiffres was given his award for permanent disability, he had long since resumed teaching school and engaging in additional activities, such as seeking recruits for summer camp and working at the camp in a limited fashion. There is no doubt, however, that his life was more restricted and controlled than before the 1951 heart attack (although the indications are that he did not adhere as faithfully as he should have to his treating physician's advice, for example, to move nearer to school in order to eliminate the 18–20 mile daily journey), and that he had the permanent weakness and symptoms associated with his myocardial infarct. That incapacity was measured at 37.5% of total permanent disability. With such disability it was to be expected that he would have the pains and limited capacity for exertion that were its indicia. They formed the basis for his entitlement to the compensation benefits adjudged to be due him. The evidence introduced at both hearings supports the view that the symptoms and restraints on physical effort between January 1953 and January 1955 when the second myocardial infarction occurred were consonant with a heart condition represented by 37.5% permanent loss of physical capacity in the sense of the workmen's compensation law.

When the January 1955 infarction took place, as we have noted, it produced increased disability. But proof of that fact only satisfied one of the conditions prerequisite to the granting of an additional compensation allowance. The causal connection between the first and the new attack re-

mained to be shown. Petitioner's doctors said in effect that the first infarction impaired the circulatory function of the heart, therefore all they needed to know was that another coronary infarction took place regardless of where, how or when it occurred, in order to warrant the medical opinion that the former was the responsible agent of the latter. But they did not explain the mechanism of the second infarction —the physical operation which took place before and at the time of the attack. Nor did they say how the process, whatever its course, was causally related to the 1951 occlusion. Further, they did not give any satisfactory explanation in terms of presence or absence of causal connection as to the significance of the difference in location of the first and second infarcts, one in the anterior heart wall and the other in the posterior wall.

Respondent's heart specialist rejected the thesis of petitioner's doctors. He maintained that the circumstances of the case negate causal connection between the two attacks and support the conclusion that they were unrelated. He regarded the existence of the progressive disease of coronary sclerosis in Schiffres prior to the 1951 occlusion as crucial. That the arterial condition existed throughout the period from 1951 to his death in 1958 we believe is supported by the greater weight of the evidence. And we accept also the conclusion that the 1951 work accident in some manner so acted upon the underlying sclerosis as to cause or contribute to the infarct that occurred. Respondent's expert testified (and there seems to be no serious dispute about this aspect of the matter) that when the occluded vessel in the anterior coronary wall became necrosed, the involved portion ended its functional life in the circulatory system. Compensatory collateral vessels came into operation, and in time scar tissue replaced the infarcted artery. The collateral circulation was not a complete substitute or fully compensatory for the original vessel. The heart capacity remained permanently impaired but the victim of the attack, recognizing his resulting limited capacity—for which he was being awarded compensa-

tion—and living within it, had a reasonable chance of living indefinitely.

Respondent's cardiologist had examined Schiffres and taken electrocardiograms three times: May 26, 1952, January 5, 1953 and March 15, 1956. On the first occasion, about a year after the 1951 attack, clinical examination of the heart was negative; fluoroscopic examination was likewise negative; the electrocardiogram revealed a healed myocardial infarction of the anterior wall. The 1953 examination indicated that the condition had been static since May 26, 1952; nothing different appeared on the electrocardiogram. The March 15, 1956 examination was about 14 months after the second coronary attack and stroke. At that time the electrocardiogram disclosed changes suggestive of a healed posterior wall infarction. Schiffres showed also the limitation of motion in the upper and lower right extremity due to the cerebral embolism. It was the doctor's opinion that there was no causal connection between the occlusion of 1951 and the work effort which produced it, and the 1955 acute myocardial infarction of the posterior coronary wall. In his judgment the only element the two attacks had in common was the coronary arteriosclerosis, the progressive disease which no one suggested came from the 1951 work strain.

The doctor explained that a myocardial infarction results from the closure of a coronary vessel and the consequent loss of blood supply and oxygen at that site for a sufficient time to cause death of the tissue. After some weeks, while collateral substitutionary circulation is being established, the infarct goes through a healing process and scar tissue is formed. When the healing process is complete the infarct is at an end, its pathological effects have spent themselves. It is true, he said, that, as in this case, the cardiac reserve is left somewhat impaired permanently but "for that we give a disability, but on a practical basis, people live for 20–25 years with a heart that functions normally." When Schifres' second infarct started up in another coronary vessel, an opposite one in the posterior wall, because of a developing or

developed thrombus there, it had nothing to do with the lowered coronary reserve. He did not have heart failure. The process of formation of the thrombus is entirely different and unrelated. It came from the progressively sclerotic coronary arteries, the only common factor in the two attacks.

In short, respondent's medical expert said that Schiffres had arteriosclerosis of the coronary arteries. The 1951 occlusion (precipitated or contributed to by the employment strain) was an incident in the life of the disease. It came, it inflicted its permanent damage, it spent itself except for that damage when the collateral circulation was established and the scar tissue was formed, and the arteriosclerotic disease continued its progressive path. Thereafter, any thrombus-produced occlusion in an opposite wall artery (as distinguished from cardiac failure) would bear no causal relation to the first healed infarct. This view, he maintained, was the result of his experience in studying coronary artery disease, and of scientific evidence produced by studies in which he and others participated. He had written and lectured to the same effect and the concept was accepted by most authorities in the field.

### III.

We have endeavored to set down (1) the disparate and irreconcilable conflict in the medical theories of petitioner's and respondent's doctors as to causation between succeeding myocardial infarcts, and (2) the paucity of medical proof in the case as to the physical process, the mechanics, by which the first infarct acted as a causative agent over three years later in producing the second infarct. Let us suggest the problem which concerns a court composed of laymen, not physicians. Facts must be found in the record (as distinguished from mere conclusory statements) which will demonstrate to the inquiring and reasoning judicial mind that the relation of cause and effect existed between the widely separated incidents. And that conclusion can be accepted only if

the facts proved and inferences from them are sufficiently credible and convincing as to outweigh incompatible facts or inferences.

Some illustrations may bring the judicial task into sharper focus. Assume that a workman suffers a compensable injury to the fingers of one hand which causes some loss of dexterity for which he receives a compensation award for a percentage of permanent disability of the hand. Later he obtains a position with another employer and while operating a machine the hand is caught and destroyed because of the impaired dexterity. Even though his disability was increased by this mishap, obviously any additional compensation would be awarded against the second employer (who accepted him as an employee with his existing disability) because he had suffered a new accident. Recovery could not be allowed against the first employer on the theory that the increased disability was causally related to the original accident.

Consider further, that an employee had an underlying, quiescent, symptomless and non-disabling disease in his back, or a predisposition in his back to some kind of infectious process. Assume that he injured his back in the course of employment and that after a period of treatment he was awarded compensation for a percentage of total permanent disability. Thereafter, as a matter of steady progression, the lighted-up disease or infectious process continued, gradually producing more and more disability. In that instance medical opinion would undoubtedly attribute the increase in incapacity to the work injury, and the courts would accept the causal connection as established. Again, suppose that after the accident and treatment the lighted-up disease or infectious process lapsed into the previous quiescent state but left some permanent disability. Of course, the workman would receive an award for the percentage of permanent disability. But if the quiescent state was again stirred into activity by a fall at home or by some systemic condition, any increase in incapacity would not be chargeable to the original employment accident. Other hypothetical variations could

be outlined to further describe the judicial task in these cases.

In the last analysis, we must come back to the test which the law has established for the disposition of issues of causality. The burden is on petitioner to demonstrate the causal connection between the first and second myocardial infarctions by the greater weight of the believable evidence. The Deputy Director found that the burden had been sustained; the County Court reviewing the matter *de novo* on the record reached the opposite decision. The disparate results led us to an independent study of the evidence and to the analysis detailed above. That analysis has induced the feeling that. respondent's position of absence of causal connection between the 1951 and 1955 heart attacks is more persuasive on this record than petitioner's contrary contention. But, basically our conclusion is that the probative force of petitioner's proof falls short of preponderating in favor of the claimed relation between the two infarctions.

## IV.

Thus, we are brought to the death case. As has been noted earlier, following the January 1955 coronary attack and stroke, Schiffres was seriously disabled. After some rehabilitation therapy he returned on a limited scale to teaching and to the summer camp employment. He attended camp in the summer of 1958, returned home on August 26 and spent the next two days preparing to return to school. He died in bed sometime during the night of August 28. No doctor was in attendance. No autopsy was performed.

The physician who had been caring for him since 1951 could not say whether the death-producing episode was a "pulmonary embolism, cerebral embolism or coronary occlusion." He was not "prepared to say that the final episode was a cardiac death or a cerebral death." At another point he agreed with the cause of death noted on the death certificate, *i. e.*, coronary arteriosclerosis, although the medical ex-

aminer who completed the certificate had never seen the decedent alive, and had not performed an autopsy. Then, at still another point he said he "would be willing to state as his opinion that this man died as a result of the heart disease associated with myocardial infarction." He did not specifically state on his direct or cross-examination that the first coronary attack caused or contributed to the death. He asserted that "the myocardial infarctions and the cerebral episode" undoubtedly shortened Schiffres' life. At the close of the cross-examination, the Deputy Director asked if "this" would "summarize" his "testimony generally":

"* * * These three conditions being associated with each other apparently resulted in his eventual death, the death and the two cardiac incidents and the one cerebral episode all being interrelated, you have concluded. This despite the fact that there was no postmortem examination, and the basis being, I presume, statistically from common experience or medical probability; is that right, sir?
A. That is a good resume, yes."

Petitioner's expert witness in cardiology, in discussing the relation between the death and the 1951 myocardial infarction, reiterated the position he advanced with respect to the second infarction, namely, there is an inevitable causal connection between a first infarction and any subsequent one. And he said on the basis of the history that Schiffres probably died of another myocardial infarction in his sleep on August 28, 1958. That conclusion he felt was a reasonable probability based on his experience, but it could not be scientifically accurate without an autopsy.

Respondent's cardiologist took the same position as to the cause of death as he did with respect to the relation between the first and second infarctions. He maintained that on the history of the case and particularly the fact that Schiffres had advanced arteriosclerosis of the coronary and cerebral arteries, the death was due to the progressive nature of the coronary artery sclerosis, and was unrelated to the original heart episode produced or contributed to by the employment strain.

■ The considerations which led us to the conclusion that the requisite causal connection between the 1951 heart attack and the second one three and one-half years later had not been sustained, apply with even greater force to the fatal attack seven years later. It is not necessary to repeat them. Suffice it to say we find ourselves unable to conclude that petitioner has sustained the burden of proving the required causality by the greater weight of the believable evidence.

Accordingly, the judgment of the County Court is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.