230 N.J. Super. 245 (1989)
553 A.2d 361
SOLOMON TAYLOR, DECEASED, BY HIS WIDOW AND DEPENDENT, ANNIE TAYLOR, PETITIONER-APPELLANT,
v.
ENGELHARD INDUSTRIES, RESPONDENT-RESPONDENT.
ANNIE LIZZIE TAYLOR, PETITIONER-APPELLANT,
v.
ENGELHARD INDUSTRIES, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 1989.
Decided February 9, 1989.
*247 Before Judges J.H. COLEMAN and D'ANNUNZIO.
Marc J. Gordon, argued the cause for appellants (Margolis & Gordon, attorneys, Mark A. Nulman, on the brief).
Carol M. Romano, argued the cause for respondent (Connell, Foley & Geiser, attorneys, George J. Kenny of counsel; Carol M. Romano, on the brief).
The opinion of the court was delivered by J.H. COLEMAN, P.J.A.D.
In this workers' compensation appeal, the significant issue raised is whether a worker who has been adjudicated totally and permanently disabled and found to be entitled to benefits from the Second Injury Fund (Fund) is entitled to an award increasing the percentage of disability payable by the employer. We hold that unless there has been additional employment and another accident or occupational exposure, there can be no award for any increase in the disability.
The facts are not complicated. Solomon Taylor, now deceased, was employed by Englehard Industries between 1945 and August 24, 1976. During the course of that employment, he was exposed to smoke, dust, fumes and other pulmonary irritants. Prior to the termination of employment, decedent suffered with severe cardiovascular disease and severe hypertension. On November 29, 1977, he was found to be totally and permanently disabled from all causes. He was awarded 55% of total permanent disability for chronic bronchitis and pulmonary emphysema payable by Englehard. He was also found eligible to collect benefits from the Fund effective November 20, 1981. Decedent died on September 18, 1981 while still collecting the 55% pulmonary disability. He never worked after August 24, 1976.
Decedent's widow Annie Lizzie Taylor filed an application for an increase in decedent's compensable pulmonary disability alleging that the disability worsened between November 29, *248 1977 and the time of death. She also filed a claim for dependency benefits. The two claims were consolidated for trial. An autopsy revealed the cause of death was a ruptured arteriosclerotic abdominal aortic aneurysm. At the conclusion of the trial, the judge dismissed both claims. This appeal followed. We now affirm.
On September 16, 1981 decedent went to the emergency room of St. James Hospital complaining of pains in his back and stomach. He also said he had vomited and suffered from diarrhea which was dark. The judge found the following occurred at the hospital:
A diagnosis of gastrointestinal bleeding and history of chronic lung disease was made.
Tests were ordered by Dr. Contreras, and the patient placed on a stretcher and admitted.
Dr. Pugliese, the decedent's family physician, was notified at 6:30 p.m., spoke to Dr. Contreras, and a surgical consultation was ordered.
The first consulting examination was done by Dr. Yepez on September 16th, whose report appears in Exhibit P-2, the St. James Hospital records of September 16th to 18th, 1981.
That report includes the following impressions of Dr. Yepez: Peptic ulcer disease, rule out gastritis, rule out gastrointestinal malignancy.
The doctor suggested that the present work-up continue.
A second consultation took place on September 17th, 1981, done by a Dr. Fortunato.
His impressions were:
Number 1. Upper GI bleeding secondary to ulcer. Rule out cancer of stomach.
Number 2. Dyspnea and wheezes secondary to asthma.
At 4:15 p.m. on September 18th Taylor went into cardiac arrest.
For approximately 40 minutes a team attempted to resuscitate the patient, but to no avail.
* * * * * * * *
A routine chest x-ray done before admission, while the patient was in the emergency room, is reported on the face sheet of the emergency room record to be chest or lungs "hyperinflated".
The full record, however, discloses that the chest x-ray taken on September 16th, 1981, at the request of Dr. Contreras, revealed, "The lungs are hyperaerated and clear. No pleural effusion. The aorta is arteriosclerotic with aneurysmal dilatation of the descending portion (emphasis supplied)".

*249 The chest x-ray is referred to in the clinical resume signed by Dr. Pugliese and written after the fact of death.
The x-ray interpretation meant that the descending portion of the aorta was enlarged or had spread out from its normal size. Dr. Wagostino Pugliese, a general practitioner, and Dr. Rowland D. Goodman, III, testified that the pulmonary disabilities contributed to the cause of death because the severe pulmonary pathology made surgery to correct the ruptured abdominal aortic aneurysm too great a risk.
The judge of compensation rejected petitioner's experts opinions. He stated:
That opinion presupposes that his physicians and surgeons were aware of the fact of an aneurysm in the process of rupturing or about to rupture, thereby imminently threatening the patient's life, and that they had an opportunity to consider and reject surgery as a viable alternative under the circumstances of the patient's advanced pulmonary disease.
A close perusal of the St. James Hospital records from September 16th through 18th, 1981, leads me to a contrary conclusion.
It appears from that record that the emergency room doctor diagnosed gastrointestinal bleeding and, although he had a chest x-ray taken, he made no mention of the aneurysmal dilation of the patient's aorta.
The two consulting physicians likewise demonstrate, in their reports contained in the aforementioned hospital records, again making no mention of any aneurysm and, instead, "working the patient up" on the basis of a gastrointestinal ulcer, that they were unaware of the aneurysm disclosed by chest x-ray on September 16th. Consequently, there is nothing in the hospital record to show that heroic surgical intervention was ever considered or contemplated before the patient went into convulsion and cardiac arrest.
Petitioner contends that the judge of compensation's denial of her application for dependency benefits is not supported by the evidence. Based on our careful study of the record, we are completely satisfied that the findings of the judge of compensation are supported by sufficient credible evidence present in the record as a whole. Close v. Kordulak Bros., 44 N.J. 589, 599 (1965); De Angelo v. Alsan Masons, Inc., 122 N.J. Super. 88, 89-90 (App.Div. 1973), aff'd o.b. 62 N.J. 581 (1973). Absent proof that surgery was considered and rejected because of the lung pathology, the opinions of Dr. Goodman and Dr. Pugliese were properly rejected as having no *250 factual underpinning. Put simply, petitioner postulates that some unidentified doctors decided decedent should die because surgery was too risky. It is inconceivable to us that if some unidentified doctors made such a determination, they would not have obtained decedent's or his widow's informed consent and made that consent part of the hospital record, if for no other reason than to guard against a medical malpractice claim. Although the absence of such notation in the hospital record is not determinative, it does render petitioner's theory dubious.
Petitioner further contends that the judge of compensation erred in refusing to permit her to establish an increase in decedent's pulmonary disability. Because decedent died before he started collecting benefits from the Fund, petitioner filed both a dependency claim and a claim for an increase in decedent's pulmonary disability. Under the 1980 amendments to the Workers' Compensation Act, L. 1980, c. 83, § 1, effective August 21, 1980, dependents of workers who die from work related conditions while receiving compensation benefits from the Fund. See Beyer v. Porter-Hayden, 104 N.J. 104 (1986); Wehrle v. American Can Co., 224 N.J. Super. 400 (App.Div.), remanded 111 N.J. 642 (1988), on remand, 228 N.J. Super. 382 (App.Div. 1988). But such benefits are payable "only where the compensable occupational injury or disease of the decedent is a material contributing factor to his death." N.J.S.A. 34:15-95.4. Dismissal of the dependency claim means petitioner is not entitled to collect dependency benefits from either the employer or the Fund. Hence, the claim for an increase in the pulmonary disability was filed in an attempt to require the employer to pay petitioner, pursuant to N.J.S.A. 34:15-12e, up to an additional 202 1/2 weeks of benefits. The judge of compensation concluded that once a worker has been found to be totally and permanently disabled as a result of the combined effects of the last occupational accident or exposure and the unaggravated preexisting disabilities, there can be no further award of compensation for any increase in the work-related disability.
We fully agree that there can be no further increase in a compensable disability after an adjudication of 100 percent total *251 permanent disability unless the worker returns to work and is reinjured. This was clearly recognized in Mayti v. Singer Mfg. Co., 76 N.J. Super. 379, 382-383 (Cty.Ct. 1962), aff'd on other grounds, 79 N.J. Super. 556, 558 (App.Div. 1963). The denial of an increase in disability was affirmed by the Appellate Division in Mayti because petitioner's failed to prove any increase in her disability. The court also stated "[we] therefore are not to be considered as joining in or approving any other views expressed by the county judge." Ibid. We now adopt the views expressed by then Union County Court Judge Fulop in Mayti.
Judge Fulop agreed with the judge of compensation and rejected petitioner's argument that she was entitled to an additional award. The court stated that while it defies logic that a person could be more than 100 percent disabled, an award for 100 percent total disability only means that "his disabilities as an economic working unit are such as to entitle him to the maximum statutory compensation." 76 N.J. Super. at 382. The court distinguished a 100 percent disabled employee who returns to work and is reinjured from one who seeks an increase in disability from the same injury without subsequent injury:
A person who has been awarded compensation for 100% total permanent disability may in fact engage in gainful employment thereafter. N.J. Super. 34:15-12(b) expressly provides for that possibility. If again injured in a compensable accident, it would seem that he should be entitled to compensation for the second injury. If compensation were not allowed under such circumstances, the employee would be in the position of an outlaw under ancient law who might be injured or killed with impunity....
On the other hand, an award of compensation for 100% total permanent disability should preclude any further award for any increase in the effects of the same injury. This is not because the effects of the injury may not increase. They may and frequently do increase and the condition of the employee may grow worse. But further compensation may not be allowed because the employee has received all that the law allows. The award could have been no higher if the subsequent increase of the disability had been present when the original award was made. This view would seem unquestionable where the 100% award is against the employer. It is implied in United Engineers and Constructors, Inc. v. Anderson, 14 N.J. Misc. 799, 187 A. 363 (Sup.Ct. 1936), cited by the judge of compensation. [76 N.J. Super. at 382-383]
*252 The only difference between 100 percent disability payable by the employer alone and a split between the employer and the Fund is the source of the payment. Here, decedent was awarded 100 percent total permanent disability for his employment exposure at Englehard Industries but the payment was simply divided between the employer and the Fund. This is so because under our law the employer is responsible to pay for the end result  here total disability. Paul v. Baltimore Upholstering Co., 66 N.J. 111, 129 (1974); Richardson v. Essex National Truck & Co., 119 N.J.L. 47, 49-50 (E & A 1937).
The Fund was created to pay that portion of a total and permanent disability award which was not caused by the last employer. The purpose is to encourage employers to hire partially disabled persons. Belth v. Anthony Ferrante & Son, Inc., 47 N.J. 38, 48-49 (1966); Schulman v. Male, 70 N.J. Super. 234, 240-241 (App.Div. 1961). Simply because part of the 100 percent total permanent disability was payable by the Fund for the employer's benefit, does not alter the fact that on November 29, 1977 decedent was found to be totally and permanently disabled. That judgment contemplated there would be no improvement in decedent's condition. See N.J.S.A. 34:15-36. For purposes of determining the appropriateness of an increase in disability, the prior award of 100 percent is treated as if the entire award was against the employer. An employer cannot be responsible for more than 100 percent total permanent disability for a single occupational accident or exposure. See generally Padilla v. Concord Plastics, Inc., 221 N.J. Super. 301 (App.Div. 1987), aff'd 113 N.J. 508 (1988).
There is still another reason why dismissal of the reopener was appropriate in this case. Ordinarily, the doctrines of res judicata and collateral estoppel do not preclude reopening a worker's compensation judgment and increasing the compensable award. See N.J.S.A. 34:15-27, and 58; Schiffres v. Kittatinny *253 Lodge, Inc., 39 N.J. 139, 148 (1963); Hopler v. Hill City Coal & Lumber Co., 5 N.J. 466, 470-471 (1950); Restatement (Second) of Judgments, § 20(1)(c) at 170 (1982). But this case is a clear exception. Res judicata is defined as "issue preclusion" under Restatement (Second) of Judgments § 27 at 250 (1982) and includes estoppel:
When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.
Accord, Alfone v. Sarno, 87 N.J. 99, 112, n. 9 (1981); Plainfield v. Public Service Electric & Gas Co., 82 N.J. 245, 258 (1980). Under the doctrine of res judicata, a cause of action which has been finally determined between parties on the merits by a tribunal having jurisdiction cannot be relitigated by those parties or their privies in a new proceeding. Roberts v. Goldner, 79 N.J. 82, 85 (1979).
Collateral estoppel, as a separate concept, is defined in State v. Gonzalez, 75 N.J. 181, 186 (1977): "Collateral estoppel is that branch of the broader law of res judicata which bars relitigation of any issue which was actually determined in a prior action, generally between the same parties involving a different claim or cause of action." (Emphasis supplied; citations omitted.) The principles of res judicata and collateral estoppel are applicable to administrative hearings. City of Hackensack v. Winner, 82 N.J. 1, 31-33 (1980). Because the November 29, 1977 judgment awarded decedent 100 percent total permanent disability, that judgment precludes any further award for an increase in that disability absent a new accident or exposure.
The judgment dismissing the dependency claim and the application for an increase in decedent's compensable pulmonary disabilities are affirmed.
AFFIRMED.