696 A.2d 546

JEANNE C. LEMELLEDO, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF–RESPONDENT, v. BENEFICIAL MANAGEMENT CORP. OF AMERICA AND BENEFICIAL NEW JERSEY, INC., DEFENDANTS–APPELLANTS.

Argued February 18, 1997—Decided July 3, 1997.

*Burt M. Rublin,* a member of the Pennsylvania bar, argued the cause for appellants (*Archer & Greiner,* attorneys; *Sean T. O'Meara,* on the briefs).

*Michael D. Donovan,* a member of the Pennsylvania bar, argued the cause for respondent (*Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano,* attorneys; *Charles N. Riley,* on the letter brief).

*Gail M. Lambert,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey, *Peter Verniero,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, and *Jeffrey C. Burstein,* Deputy Attorney General, of counsel.

*Melville D. Miller, Jr.,* President, argued the cause for amicus curiae Legal Services of New Jersey (*Mr. Miller,* attorney; *Mr. Miller and Dawn Miller,* on the brief).

*Clark E. Alpert* submitted briefs on behalf of amicus curiae The Mortgage Bankers Association of New Jersey (*Alpert & Levy,* attorneys; *Mr. Alpert and E. Robert Levy,* of counsel).

*Jonathan Romberg* submitted a brief on behalf of amicus curiae Seton Hall Law School Center for Social Justice.

*Madeline L. Houston* submitted a brief amicus curiae, pro se.

The opinion of the Court was delivered by

HANDLER, J.

"Loan packing" refers to a practice on the part of commercial lenders that involves increasing the principal amount of a loan by combining the loan with loan-related services, such as credit

insurance, that the borrower does not want. In this case, a borrower secured a commitment from a commercial lender to provide a loan to defray the costs of college tuition for the borrower's daughter. When the borrower received the loan proceeds, the principal amount to be repaid included unrequested and unexpected premiums for credit insurance.

The borrower brought a class-action lawsuit challenging the extra charges affixed to her loan, contending that the practice was illegal and thus entitled her to damages. The specific issue raised in this appeal is whether the New Jersey Consumer Fraud Act applies to lenders who engage in "loan packing."

I

On or about July 19, 1992, Jeanne Lemelledo ("plaintiff") applied for a $2,000 loan for her daughter's college education from defendants Beneficial Management Corp. and Beneficial New Jersey (collectively referred to as "defendant"). Shortly after receiving the application, defendant notified plaintiff that the loan had been approved in full.

Plaintiff went to defendant's office with the expectation of receiving a check in the amount of $2,000. Instead, however, defendant presented her with numerous forms, including a loan contract for $2,538.47 and a check payable to her for $2,203.19. It is unclear why plaintiff received $203.19 more than she had requested in her application. The difference between the amount in the loan contract and the amount of the loan check ($335.28) was listed as "Amount Paid to Others on Your Behalf" and consisted of credit-insurance premiums, to be paid initially by defendant and added to the loan principal to be repaid by plaintiff. The premiums—credit property insurance ($170.10), credit disability insurance ($123.98), and credit life insurance ($41.20)—covered the possibility that plaintiff would default on her loan repayments. The loan, including the insurance premiums, was provided at an interest rate of twenty-eight percent; plaintiff was to make thirty-six monthly payments of $105.00 each.

Defendant apparently offers such insurance policies to all borrowers in order to provide greater assurance that the loans will be repaid. It sells the policies through either one of its insurance subsidiaries or an unaffiliated insurance company and receives a forty-percent commission from each sale. Defendant also receives substantial interest income from the sales because the amount of the insurance premium is incorporated into the loan principal and accrues interest, in this case at a rate of twenty-eight percent. When defendant sells the policies to borrowers, it provides them with a form entitled "Disclosure of Credit Costs," which states that the insurance is not a prerequisite to obtaining credit and that, if the borrower chooses to purchase the insurance, she can do so from any insurer. Those disclosures are required by law. *N.J.S.A.* 17:10–14.1a (replaced by *N.J.S.A.* 17:11C–21d).

Although plaintiff admits that defendant informed her, through the "Disclosure of Credit Costs" statement, that she did not have to purchase the insurance premiums, she alleges that defendant implicitly led her to believe that, if she did not purchase the insurance, she would not receive the loan. She points to several of defendant's actions that allegedly created such an implication, including: the presentation of the insurance and loan contracts as a single transaction (i.e., a single contract with one lump sum presented at the time of the loan); the failure to discuss the insurance separately from the loan itself and to evaluate her specific need or lack thereof for the insurance; and the pressure put on her, that is, the implicit threat that if she declined the insurance, she would have to return at a later date to receive the reprocessed loan proceeds.

Plaintiff stresses that borrowers in her position, with lower incomes and without substantial credit opportunities elsewhere, are particularly vulnerable to implicit misrepresentations about the need to purchase credit insurance and to purchase it from the lender. Apparently, a substantial percentage of Beneficial's loan customers are low-income and thus have limited choices about

sources of credit. Plaintiff also emphasizes that credit insurance primarily benefits the lender, not the borrower.

Shortly after receiving the loan proceeds, plaintiff repaid the $2,203.19 in full. Defendant then sent her four $100 payment coupons to cover the insurance premiums plus interest on those premiums. She made the first two payments, but refused to make the final two. Defendant brought suit against her in August 1994 to recover the remaining balance, but it voluntarily dismissed the claim about three months later.

Almost immediately after the dismissal, plaintiff instituted a class-action lawsuit against defendant in the Law Division, alleging violations of the Consumer Fraud Act ("CFA"), *N.J.S.A.* 56:8–1 to –20, and the Consumer Loan Act ("CLA"), *N.J.S.A.* 17:10–1 to – 26.[1] She also alleged breach of contract, fraudulent inducement, conversion, common-law fraud, and criminal usury.

Defendant moved to dismiss the CFA, CLA, and usury claims for failure to state a claim upon which relief could be granted. *R.* 4:6–2(e). The Law Division granted the motion as to the CFA and usury claims, concluding that the CFA did not apply to loan packing. The Appellate Division granted plaintiff's motion for leave to appeal the dismissals and reinstated the CFA claim. 289 *N.J.Super.* 489, 674 *A.*2d 582 (1996). The court affirmed the dismissal of the usury claim.[2] *Id.* at 502, 674 *A.*2d 582.

---

[1] On January 8, 1997, the Governor signed the New Jersey Licensed Lenders Act, which combines the CLA with two mortgage-related statutes. *L.* 1996, *c.* 157 (codified at *N.J.S.A.* 17:11C–1 to –49). The Act maintains the aspects of the CLA that are relevant to this case. It also incorporates a relevant CLA-based regulation, *N.J.A.C.* 3:17–5.1 (replaced by *N.J.S.A.* 17:11C–21) (prohibiting mandatory credit insurance), and adds a new remedy, namely, treble damages for injured consumers, *L.* 1996, *c.* 157, § 33(b) (codified at *N.J.S.A.* 17:11C–33b). The CLA did not contain that remedy, instead providing consumers with the right only to cancel the fraudulent loan contract. The statutory revision affects neither our analysis nor our conclusion in this case.

[2] Plaintiff's usury claim alleged that the interest rate of 28% was actually higher because the credit-insurance premium (or at least that portion of the premium that defendant retained as commission) was a form of interest. The

We granted defendant's motion for leave to appeal the reinstatement of the CFA claim. 146 *N.J.* 561, 683 *A.2d* 1158 (1996).

## II

 Because this interlocutory appeal arises from the Law Division's dismissal of plaintiff's CFA claim for failure to state a claim upon which relief can be granted, we review the legal issues at stake on the assumption that the facts, as alleged by plaintiff, are true. *See Feinberg v. Department of Envtl. Protection,* 137 *N.J.* 126, 129, 644 *A.2d* 593 (1994). Our sole inquiry is thus whether the CFA applies to defendant's actions as they are alleged by plaintiff.

### A.

 The CFA is intended to protect consumers "by eliminating sharp practices and dealings in the marketing of merchandise and real estate." *Channel Cos. v. Britton,* 167 *N.J.Super.* 417, 418, 400 *A.2d* 1221 (App.Div.1979); *see Daaleman v. Elizabethtown Gas Co.,* 77 *N.J.* 267, 271, 390 *A.2d* 566 (1978). It prohibits

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[ ] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been mislead, deceived or damaged thereby....

[*N.J.S.A.* 56:8–2.]

The CFA defines "merchandise" as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to

---

Appellate Division rejected that argument, relying on our decision in *Sherman v. Citibank,* 143 *N.J.* 35, 668 *A.2d* 1036 (1995) (holding that late fees were not "interest"), *vacated,* —— *U.S.* ——, 116 *S.Ct.* 2493, 135 *L.Ed.2d* 186 (1996). The Appellate Division also cited several statutory provisions to support its disposition of the claim. 289 *N.J.Super.* at 502–03, 674 *A.2d* 582. Plaintiff did not seek leave to appeal the Appellate Division's affirmance of the dismissal of the usury claim, and we thus do not reach that issue.

the public for sale." *N.J.S.A.* 56:8–1(c). It defines "advertisement" as

> the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof *or to make any loan....*
>
> [*N.J.S.A.* 56:8–1(a) (emphasis added).]

The CFA vests the Attorney General with jurisdiction to enforce its provisions through a variety of mechanisms, *N.J.S.A.* 56:8–3 to –8, –11, –15 to –18, & –20, but it also provides individual consumers with a cause of action to recover refunds, *N.J.S.A.* 56:8–2.11 to –2.12, and treble damages for violations, whether in good faith or otherwise, *N.J.S.A.* 56:8–19. The Attorney General enforces the CFA through the Division of Consumer Affairs. *N.J.A.C.* 13:45–1.1 to –5.6. The "rights, remedies and prohibitions" created by the CFA are cumulative to any other rights, remedies, and prohibitions created by the common law or other statutes. *N.J.S.A.* 56:8–2.13.

█ The language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud. *See Barry v. Arrow Pontiac,* 100 *N.J.* 57, 69, 494 *A.*2d 804 (1985); *Martin v. American Appliance,* 174 *N.J.Super.* 382, 384, 416 *A.*2d 933 (Law Div.1980). Accordingly, our courts have invoked it to cover a wide variety of practices. *E.g., Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 647 *A.*2d 454 (1994) (unsolicited sale); *49 Prospect Street Tenants Ass'n v. Sheva Gardens, Inc.,* 227 *N.J.Super.* 449, 547 *A.*2d 1134 (App.Div.1988) (apartment rental); *Jones v. Sportelli,* 166 *N.J.Super.* 383, 399 *A.*2d 1047 (Law Div.1979) (provision of product to physician free of charge with expectation that physician would prescribe product in future).

In light of the broad legislative intent evident from the language and policy goals of the CFA, we evaluate whether loan packing violates its provisions. We first look to the language of the statute itself to determine if it encompasses the practice.

■ By its terms, the CFA is applicable to the provision of credit. It specifically includes loans in its definition of what constitutes an "advertisement." *N.J.S.A.* 56:8–1(a). Moreover, its definition of "merchandise" as "anything offered, directly or indirectly to the public for sale" is more than sufficiently broad to include the sale of credit. *See Tuxedo Beach Club v. City Federal Savings Bank,* 749 *F.Supp.* 635, 649 n. 13 (D.N.J.1990). Given the broad language of the CFA, we conclude that its terms apply to the offering, sale, or provision of consumer credit.

■ Moreover, although several lower courts have held that the payment of insurance *benefits* is not subject to the CFA,[3] *Nikiper v. Motor Club of America,* 232 *N.J.Super.* 393, 401, 557 *A.*2d 332 (App.Div.), *certif. denied,* 117 *N.J.* 139, 564 *A.*2d 863 (1989); *Pierzga v. Ohio Casualty Group of Ins. Cos.,* 208 *N.J.Super.* 40, 47, 504 *A.*2d 1200 (App.Div.), *certif. denied,* 104 *N.J.* 399, 517 *A.*2d 402 (1986), our reading of the CFA convinces us that the statute's language is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers. *See Dodd v. Commercial Union Ins. Co.,* 373 *Mass.* 72, 365 *N.E.*2d 802, 807 (1977); *Fortunato v. Conte,* 92 *N.J.A.R.*2d (INS) 17, 1992 *WL* 257727 (1992).

Defendant places great significance on the failure of the CFA and its implementing regulations specifically to include insurance. That omission, however, is far from determinative. Given that "[t]he fertility of [human] invention in devising new schemes of fraud is so great …," *Kugler v. Romain,* 58 *N.J.* 522, 543 n. 4, 279 *A.*2d 640 (1971), the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations. *See Federal Trade Comm'n v. Sperry & Hutchinson Co.,* 405 *U.S.* 233, 240, 92 *S.Ct.* 898, 903,

---

[3] We express no opinion about the validity of those holdings. *See Rodio v. Smith,* 123 *N.J.* 345, 352, 587 *A.*2d 621 (1991) (not reaching issue of applicability of CFA to payment of insurance benefits).

31 *L.Ed.*2d 170, 177 (1972) ("Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again[, constituting] . . . an endless task.") (citation and quotations omitted).

Because the broad language of the CFA appears to include both lending and insurance-sales practices, we conclude that its terms also include the sale of insurance in conjunction with lending, that is, loan packing.

### B.

That the CFA's language covers loan packing does not automatically resolve the issue of the applicability of the CFA as a basis for remedial relief. We must address the contention that, because lenders offering credit insurance are regulated by several State agencies, to subject them to CFA liability would run counter to our traditional reluctance to impose potentially inconsistent administrative obligations on regulated parties.

In *Daaleman, supra,* we held that a privately owned public utility could not be liable under the CFA for having set rates artificially high in an allegedly fraudulent manner. 77 *N.J.* at 271–73, 390 *A.*2d 566. After noting that the legislative intent behind the CFA was to attack "sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices," *id.* at 271, 390 *A.*2d 566, we concluded that erroneous calculation of tariffs simply did not fit into that legislative definition of "selling or advertising" because of the pervasive control that the Public Utilities Commission ("PUC") exercised over the calculation and permissibility of such tariffs. *Ibid.*

We then proceeded to discuss another concern that would arise if the CFA were to apply to utilities, namely, that, given the highly regulated nature of the utility industry, "a situation would be presented where separate state agencies would have the right to

exercise concurrent jurisdiction and control over [a utility's] billings, with a real possibility of conflicting determinations, rulings and regulations affecting the identical subject matter." *Id.* at 272, 390 *A.*2d 566. We also stressed that the unique nature of the utility industry warranted a rejection of the CFA's punitive-damages provision because the purported beneficiaries of an award of punitive damages—the consumers—eventually would pay for the additional award through higher rates. *Id.* at 272–73, 390 *A.*2d 566.

The Appellate Division, in this case, reasoned that *Daaleman* stood for the proposition that an industry is exempt from the CFA if it is otherwise regulated only by a single agency. 289 *N.J.Super.* at 496–97, 674 *A.*2d 582. Because defendant was regulated by both the Department of Insurance and the Department of Banking,[4] the court determined that *Daaleman* did not preclude application of the CFA. *Ibid.*

▇▇ *Daaleman*, however, does not stand for the bright-line proposition that a regulated practice is automatically covered by the CFA or automatically exempt from it based solely on the number of administrative agencies having regulatory jurisdiction over the practice. *Cf. Daaleman, supra,* 77 *N.J.* at 274, 390 *A.*2d 566 ("There is no valid reason why a utility, simply by reason of

[4] Since the Appellate Division decided this case, the Legislature, in the Department of Banking and Insurance Act of 1996, combined the Department of Banking and the Department of Insurance into the Department of Banking and Insurance. *L.* 1996, *c.* 45 (codified at *N.J.S.A.* 17:1–1 to –24). The consolidation appears to have been more related to efficiency than to substantive administration, because the Act maintains separate Divisions of Banking and Insurance, each charged with the enforcement responsibilities of the eliminated Departments of Banking and Insurance. *L.* 1996, *c.* 45, § 4 (codified at *N.J.S.A.* 17:1–14).

Because we conclude that the number of agencies regulating a particular practice is not dispositive of whether the CFA applies to that practice, *infra* at 268–269, 696 A.2d at 552–553, that action by the Legislature does not affect our analysis. However, we will refer to the agency as the Department of Banking and Insurance even if a particular statute refers only to the Department of Banking or the Department of Insurance.

the fact that it is subject to regulation of its rates in the public interest, should be exempt from the [CFA] if it should commit fraud in connection with the marketing of merchandise.") (Pashman, J., concurring). Although *Daaleman* did concern an entity that was subject to regulation by a single agency, that factor is not dispositive in determining whether the CFA applies to a consumer practice that is subject to other regulations. Instead, a court must look to whether a "real possibility" of conflict would exist if the CFA were to apply to a particular practice, regardless of the number of agencies with regulatory jurisdiction over that practice.

*Daaleman* reflects the understanding that the Legislature does not intentionally subject regulated entities to clearly conflicting administrative regimes. We hinted at that limit in *Daaleman* itself by referring to the "real possibility of conflicting determinations, rulings and regulations...." *Id.* at 272, 390 *A.*2d 566. Such a "real possibility" existed in *Daaleman,* in which application of the CFA to utility rate-setting could have lead to the anomalous result of a tariff approved by the PUC but rejected and penalized by the Division of Consumer Affairs or the courts applying the CFA. We concluded that the Legislature could not have intended such an outcome.

In determining whether the existence of other regulations creates an exemption to the CFA for particular conduct that otherwise would fall within its provisions, it should ordinarily be assumed that the CFA applies to the covered practice. That assumption is appropriate because of the strong and sweeping legislative remedial purpose apparent in the CFA. The CFA explicitly states that the "rights, remedies and prohibitions" that it creates are cumulative to those created by other sources of law. *N.J.S.A.* 56:8–2.13. Furthermore, the CFA, in allowing for private suits in addition to actions instituted by the Attorney General, contemplates that consumers will act as "private attorneys general." *Cf. Agency Holding Corp. v. Malley–Duff & Assoc.,* 483 *U.S.* 143, 151, 107 *S.Ct.* 2759, 2764, 97 *L.Ed.*2d 121, 130 (1987) ("Both statutes bring to bear the pressure of 'private attorneys general'

on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective ... is the carrot of treble damages."); *Department of Envtl. Protection v. Standard Tank Cleaning Corp.*, 284 *N.J.Super.* 381, 411, 665 *A.*2d 753 (App.Div.1995). Eliminating CFA remedies for otherwise-covered practices may undermine that important and calculated legislative objective.

Both of those aspects of the CFA—its recognition of cumulative remedies and its empowerment of citizens as private attorneys general—reflect an apparent legislative intent to enlarge fraud-fighting authority and to delegate that authority among various governmental and nongovernmental entities, each exercising different forms of remedial power. That legislative intent is readily inferable from the ongoing need for consumer protection and the salutary benefits to be achieved by expanding enforcement authority and enhancing remedial redress. When remedial power is concentrated in one agency, underenforcement may result because of lack of resources, concentration on other agency responsibilities, lack of expertise, agency capture by regulated parties, or a particular ideological bent by agency decisionmakers. *See, e.g., Arcadia v. Ohio Power Co.*, 498 *U.S.* 73, 87–88, 111 *S.Ct.* 415, 423–24, 112 *L.Ed.*2d 374, 388–89 (1990) (Stevens, J., concurring) (emphasizing that Congress intended that Securities and Exchange Commission and Federal Energy Regulatory Commission both have jurisdiction over particular aspect of utility regulation because of the "difference between the goals and expertise of the two agencies"). Underenforcement by an administrative agency may be even more likely where, as in this case, the regulated party is a relatively powerful business entity while the class protected by the regulation tends to consist of low-income persons with scant resources, lack of knowledge about their rights, inexperience in the regulated area, and insufficient understanding of the prohibited practice. The primary risk of underenforcement—the victimization of a protected class—can be greatly reduced by allocating enforcement responsibilities among various agencies and

among members of the consuming public in the forms of judicial and administrative proceedings and private causes of action.

The Legislature, of course, need not diffuse enforcement power to combat fraud, and it certainly may concentrate that authority in one or more agencies or in private citizens. That judgment, however, is for the Legislature, not for this Court. We are loathe to undermine the CFA's enforcement structure, which specifically contemplates cumulative remedies and private attorneys general, by carving out exemptions for each allegedly fraudulent practice that may concomitantly be regulated by another source of law. The presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation, preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud.

In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied, as this Court was in *Daaleman*, that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility. If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation. *See Therrien v. Resource Financial Group*, 704 *F.Supp.* 322, 328 (D.N.H.1989) (reasoning that exemption from New Hampshire Unfair and Deceptive Acts and Practices Act for regulated industries would cause the exemption to "swallow the rule").

In the modern administrative state, regulation is frequently complementary, overlapping, and comprehensive. Absent a nearly irreconcilable conflict, to allow one remedial statute to preempt another or to co-opt a broad field of regulatory concern, simply because the two statutes regulate the same activity, would defeat the purposes giving rise to the need for regulation. It is not readily to be inferred that the Legislature, by enacting multiple remedial statutes designed to augment protection, actually intended that parties be subject only to one source of regulation. *Cf. Hinfey v. Matawan Regional Bd. of Educ.*, 77 *N.J.* 514, ·527–28, 391 *A.*2d 899 (1978) (holding that more specific antidiscrimination statute did not preempt broader antidiscrimination statute despite the existence of separate administrative bodies charged with combatting the same form of discrimination); *Dodd, supra*, 365 *N.E.*2d at 805 ("The mere existence of one regulatory statute does not affect the applicability of a broader, nonconflicting statute, particularly when both statutes provide for concurrent coverage of their common subject matter.").

### C.

We next must determine whether there is a "real possibility" of conflict between the CFA and other banking and insurance measures sufficient to trigger a CFA exemption for loan packing. Defendant points to four statutes (and their implementing regulations) that regulate credit-insurance sales in New Jersey: the CLA, the Insurance Trade Practices Act ("ITPA"), *N.J.S.A.* 17B:30–1 to –22, the Insurance Producer Licensing Act ("IPLA"), *N.J.S.A.* 17:22A–1 to –25, and the Credit Life and Health Insurance Act ("CLHIA"), *N.J.S.A.* 17B:29–1 to –13.

The CLA, which prohibits deceptive lending practices generally, *N.J.S.A.* 17:10–13 (replaced by *N.J.S.A.* 17:11C–20), specifically requires notice to and written consent by borrowers before lenders sell them credit insurance. *N.J.S.A.* 17:10–14.1 (replaced by *N.J.S.A.* 17:11C–21). The Department of Banking and Insurance has prohibited the conditioning of a loan on the purchase of credit

insurance. *N.J.A.C.* 3:17–5.1 (replaced by *N.J.S.A.* 17:11C–21). If a violation of the CLA is proven, the typical remedy, obtainable by the Department of Banking and Insurance or by individual consumers, is voiding of the contract, subject to a defense based on good faith on the part of the lender. *N.J.S.A.* 17:10–14 (replaced by *N.J.S.A.* 17:11C–33b). The CLA, as incorporated in the Licensed Lenders Act, now allows for treble damages by aggrieved consumers, *N.J.S.A.* 17:11C–33b, and summary revocation of a lender's license, *N.J.S.A.* 17:11C–48a.

The ITPA prohibits fraudulent insurance practices, *N.J.S.A.* 17B:30–2 to –14, and invests authority in the Department of Banking and Insurance to regulate the insurance industry in order to prevent fraud, *N.J.S.A.* 17B:30–15 to –20. The Department of Banking and Insurance is empowered to impose fines on those who act fraudulently in the sale of insurance policies and to seek cease-and-desist orders. *N.J.S.A.* 17B:30–17 & –20. Moreover, the Department can revoke or suspend a violator's license. *N.J.S.A.* 17B:30–20. No private cause of action for damages exists under the ITPA.

The IPLA concerns the licensing of insurance agents. It vests the Department of Banking and Insurance with power to revoke or to refuse to renew a license and to impose civil penalties on licensees who violate any provision of the statute or who engage in any type of fraudulent activity in the sale of insurance. *N.J.S.A.* 17:22A–17. It does not create a private cause of action.

The CLHIA regulates the provision of certain forms of credit insurance. Only the Department of Banking and Insurance has authority to enforce its provisions, which it may do through an order issued after a hearing. *N.J.S.A.* 17B:29–12.

Defendant asserts that those four statutory schemes subject it to substantial regulation by the Department of Banking and Insurance such that additional regulation by the Division of Consumer Affairs and by private civil actions would give rise to a "real possibility" of conflict. We disagree. All four of the statutes have, at least in part, the same general goal as the CFA, namely,

the prevention of fraud and misrepresentation in the sale of credit and/or insurance. The IPLA, ITPA, and CLHIA allow the Department of Banking and Insurance to define certain unfair or fraudulent practices and to take steps to eliminate those practices. Of note, the ITPA states that its remedies are cumulative. *N.J.S.A.* 17B:30–21. Moreover, the IPLA has been applied after a finding of CFA liability by a jury. *Conte, supra,* 92 *N.J.A.R.*2d (INS) 17. The CLA provides the Department of Banking and Insurance with similar authority, while also creating a private cause of action allowing for cancellation of the loan contract and an award of damages unless the lender can show that it has acted in good faith.

The CFA simply complements those statutes, allowing for regulation by the Division of Consumer Affairs and a private cause of action to recover damages. The damages cause of action in no way inhibits enforcement of the other statutes, because a court can assess damages in addition to any other penalty to which a defendant is subject. *See ibid.* Conflicting applications of the respective statutes and regulatory schemes can be avoided if courts are cognizant of the obligations created by other statutes and if they interpret the scope of the broad language of the CFA so as not to impose conflicting duties or duplicative financial obligations on the regulated party. *Cf. 49 Prospect Street, supra,* 227 *N.J.Super.* at 467, 547 *A.*2d 1134 (noting that courts should not allow double recovery when CFA and other remedial statute apply to same conduct).

■ Our administrative law recognizes procedures by which agencies and courts with overlapping jurisdiction can coordinate the exercise of their regulatory and adjudicatory responsibilities. Recognizing the potential for conflict when more than one administrative agency is charged with a particular statutory regulatory duty, agencies must harmonize the exercise of their jurisdiction so as to further that common goal. *See City of Hackensack v. Winner,* 82 *N.J.* 1, 34–35, 410 *A.*2d 1146 (1980) (noting that agencies in successive proceedings generally would be bound by

principles of comity, *res judicata*, and other similar doctrines in order to assure consistent regulatory results); *Hinfey, supra*, 77 *N.J.* at 532, 391 *A.*2d 899 ("Comity and deference to cognate tribunals are designed to assure that a controversy, or its most critical facets, will be resolved by the forum or body which, on a comparative scale, is in the best position by virtue of its statutory status, administrative competence and regulatory expertise to adjudicate the matter."); *Taylor v. Engelhard Indus.*, 230 *N.J.Super.* 245, 253, 553 *A.*2d 361 (App.Div.1989); *accord Balsley v. North Hunterdon Bd. of Educ.*, 117 *N.J.* 434, 444–45, 568 *A.*2d 895 (1990) (noting that an agency that has deferred the exercise of its jurisdiction subsequently can resolve issues that the agency retaining primary jurisdiction did not or could not resolve).

We thus have a legal and administrative framework for situations in which more than one agency possesses jurisdiction to take administrative action regarding the same regulated party or activity. Should the broad application of the CFA implicate the jurisdiction of more than one agency, those agencies should utilize that framework to resolve the conflict in an orderly and efficient manner. We believe that, in the vast majority of cases, it will be clear which of the agencies has primary jurisdiction. Once the other agency defers and the primary agency takes action, the deferring agency can take further action as may be necessary or appropriate to award any additional or complementary remedial relief. *See Balsley, supra*, 117 *N.J.* at 444–45, 568 *A.*2d 895. That understanding of shared government responsibility should be evident in the field of consumer protection. *See Conte, supra*, 92 *N.J.A.R.*2d (INS) 17 (fining and revoking license of insurance agent because of violation of IPLA and recognizing that insurance agent had been held liable by jury under CFA). Despite the existence of overlapping agency authority for the enforcement of the CFA, we are satisfied that the Division of Consumer Affairs and the Department of Banking and Insurance will be able to coordinate their regulation of loan packing so as not to subject lenders to conflicting duties and duplicative regulatory burdens.

Moreover, a court entertaining a private cause of action under the CFA might, in its discretion, defer to an agency that legitimately has exercised its jurisdiction. The court may stay proceedings until the agency has made factual determinations and awarded relief; if the relief is less than what the court is empowered to award, the court may resume its proceedings after the agency has completed its own. *Cf. Boss v. Rockland Electric Co.,* 95 *N.J.* 33, 39–42, 468 *A.*2d 1055 (1983) ("[W]here the resolution of a contested legal issue properly brought before a court necessarily turns on factual issues within the special province of an administrative agency, the court should refer the factual issues to that agency. The trial court should accept the factual determinations of the agency and lay them against the legal issues to be resolved and enter its final judgment resolving the mixed questions of law and fact based upon the agency fact finding.").

We are confident that the courts and agencies charged with enforcement of the various laws designed to protect consumers from unscrupulous practices will be able and willing to coordinate their enforcement responsibilities in a constructive and flexible manner to further the clear policy of consumer protection that the Legislature has announced through a variety of statutory mechanisms.

### III

We affirm the judgment of the Appellate Division reinstating plaintiff's CFA claim and remand the cause to the Law Division for further proceedings consistent with this opinion.

*For affirmance and remandment*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*For reversal*—None.