113 A.3d 803

DEWAN S. KHAN, M.D., ON BEHALF OF HERSELF AND ALL OTHER SIMILARLY SITUATED, PLAINTIFF, v. CONVENTUS INTER–INSURANCE EXCHANGE AND NIP MANAGEMENT, CO., LLC, DEFENDANTS.

Superior Court of New Jersey
Law Division, Civil Part, Middlesex County

Decided August 23, 2013.

*Jeffrey W. Pollock* for plaintiff (*Fox Rothschild, LLP,* attorneys).

*Mark M. Tract* (*Katten, Muchin, Rosenman, LLP*) and *Phillip A. Nemeck* (*Katten, Muchin, Rosenman, LLP*) of the New York bar, admitted pro hac vice, attorneys for defendant.

WEISBERG, J.S.C.

## I. Introduction.

In this case, plaintiff complains of violations of the New Jersey Consumer Fraud Act ("CFA"), *N.J.S.A.* 56:8–1 to –106, by defendants Coventus Inter–Insurance Exchange ("Coventus") and NIP Management Co., LLC ("NIP") in the sale of medical malpractice insurance, and in the administration of the policy once it was purchased by plaintiff. Plaintiff seeks to have the court certify the matter as a class action and to proceed with plaintiff as class representative. Before deciding whether or not class certification is appropriate, the court must address the more fundamental question of the applicability of the CFA to transactions involving the purchase and sale of medical malpractice insurance.

## II. Factual Background.

By way of factual background, plaintiff purchased a medical malpractice policy from Coventus on or about August 25, 2010. As part of her initial membership, plaintiff was required to make a one-time contribution to Coventus's surplus equal to the first year premium.[1] Plaintiff was offered and accepted the opportunity to make this surplus payment in ten annual installments. Plaintiff's obligation to make the full surplus contribution remained even if she withdrew from the exchange prior to completing the ten annual installments. On March 14, 2012, plaintiff notified defendants that she was cancelling her policy as of March 21, 2012. Plaintiff was desirous of purchasing an extended reporting period commonly referred to as tail coverage from Coventus. Plaintiff was advised by letter that she could only purchase tail coverage if she paid all her remaining surplus contributions in full instead of the remaining installments to which the parties previously agreed. Plaintiff argues that this attempt by Coventus to accelerate pay-

---

[1] Coventus is not a traditional insurance carrier, but is a non-profit physician member-owned risk-sharing exchange. NIP is the administrator of the exchange.

ment of the surplus contribution was in violation of the parties' written agreement and was in violation of the CFA. Plaintiff also alleges that Coventus and NIP improperly debited her business account without her permission for premium and surplus payments when due, and alleges this conduct also violates the CFA.

### III. Discussion.

Because it is remedial legislation, the CFA should be liberally construed to afford protection to consumers. *Marascio v. Campanella,* 298 *N.J.Super.* 491, 498, 689 *A.*2d 852 (App.Div.1997). However, the courts have also made clear that the reach of the CFA is not unlimited and that there are commercial transactions that are beyond the scope of the Act. The determining factor is not the nature of the parties to the transaction. Corporate entities have been afforded the protection of the CFA, and the protections of the CFA can extend to business operations. *Coastal Group v. Dryvit Systems,* 274 *N.J.Super.* 171, 179, 643 *A.*2d 649 (App.Div.1994); *Hundred East Credit Corp. v. Eric Shuster Corp.,* 212 *N.J.Super.* 350, 355, 515 *A.*2d 246 (App.Div.1986). It is the underlying nature of the transaction itself that determines the applicability of the CFA. *N.J.S.A.* 56:8–1(c) defines merchandise as follows, "[t]he term 'merchandise' shall include any objects, wares, goods, commodities, services or anything *offered, directly or indirectly to the public for sale.*" (emphasis added).

Our courts have interpreted this requirement of being "offered, directly or indirectly to the public for sale" as requiring that the subject "merchandise" is offered to be sold to the public at large. *Marascio, supra,* 298 *N.J.Super.* at 499, 689 *A.*2d 852. There is no doubt that insurance products offered to the public at large are subject to the CFA. *Lemelledo v. Beneficial Mgmt. Corp.,* 150 *N.J.* 255, 263–64, 696 *A.*2d 546 (1997). Like any other type of "merchandise" subject to the CFA, insurance products must be offered to the general public to fall under the purview of the Act. Insurance products that are not offered to the general public are not covered by the CFA. *Cetel v. Kirwan Fin. Grp.,*

*Inc.*, 460 *F*.3d 494, 514 (3d Cir.2006). While the insurance products in question in *Cetel* were very complex financial instruments, which were marketed only to highly sophisticated investors and not to the general public, the rationale for the *Cetel* court's decision that the products were not covered by the CFA was not the complexity of the product. This complexity was merely the reason the insurance was not available or marketed to the public at large. If, in fact, a complex insurance product were marketed to the general public it would be subject to the CFA. *Id.* at 514.

Plaintiff contends that medical malpractice insurance policies are an insurance product offered to the general public and are subject to the CFA. In support of this proposition, plaintiff cites to other insurance products such as credit insurance, credit life and disability insurance, automobile insurance, homeowners' insurance, business interruption insurance and variable life insurance that have been held to be subject to the CFA. Plaintiff argues that these insurance products are similar to medical malpractice in that many members of the general public do not have a need to purchase these products. This argument misses a critical difference between all the aforementioned examples and medical malpractice insurance. All the types of insurance referred to by plaintiff require no special qualification or licensure to purchase. Any individual member of the public is a potential purchaser, and the products are marketed to the public at large. It is a prerequisite to the purchase of medical malpractice insurance that one complete a lengthy education and training process spanning many years and then obtain licensure from the state as a physician, a highly regulated profession. These requirements, by their very nature, distinguish and separate physicians from the public at large. To put this in a quantitative perspective there were approximately 23,748 licensed physicians in New Jersey in 2008. *See* New Jersey Council of Teaching Hospitals, *Physicians Workforce Task Force Report,* p. 20 (October 2, 2009), *available at* http://njcth.org/getmedia/5b820448–8791–46e5–aa70–d690dbcbb99f/FINAL–NJ–Physician–Workforce–Report–012910.aspx. In 2012,

New Jersey had an estimated population of about 8,800,000. *See* United States Census Bureau, *American Fact Finder,* available at http://factfinder.census.gov/faces/tableservices/jsf/pages/ productview.xhtml?src=CF#. Thus, physicians represent only about .27% of the general population.[2]

IV. Conclusion.

The thrust of plaintiff's argument confuses the concept of availability to the general public with degree of use by the general public. A product may be available to the general public but only utilized by a small segment of that public. That description clearly applies to the many types of insurance that the courts have held subject to the CFA. What differentiates medical malpractice insurance is that it is available for purchase by only a tiny fraction of the population, a population that requires one to meet strict licensure and ongoing regulatory requirements. By definition, medical malpractice insurance can only be marketed to this numerically small and highly regulated population. There is no advertising or marketing campaign that malpractice insurers could engage in to enlarge their targeted audience to encompass more of the general public. This is not to suggest that the sale of medical malpractice insurance exists in an unregulated environment. It does not. The sale of this insurance is regulated by the Department of Insurance. Medical malpractice insurance, because of its non-availability to the general public, is not subject to the strictures of the CFA.

In light of this opinion, all of plaintiff's claims for violations of the CFA are dismissed with prejudice.

---

[2] The Court recognizes that the two estimates used are from different years, 2008 and 2012, but the *Physicians Workforce Report* estimates that by 2020, the physician population will only increase to 24,697. *See* New Jersey Council of Teaching Hospitals, *Physicians Workforce Task Force Report,* p. 5 (October 2, 2009), available at http://njcth.org/getmedia/5b820448–8791–46c5–aa70–d690 dbcbb99f/FINAL–NJ–Physician–Workforce–Report–012910.aspx (last visited April 23, 2015). In light of that, the estimate of .27% remains valid.