Lisa **YOURMAN,** Sarah Yourman, a minor, By and Through her guardian ad litem, Steven Yourman, and Jeffrey Yourman, by and through his guardian ad litem, Steven Yourman, Plaintiffs,

v.

**PEOPLE'S SECURITY LIFE INSURANCE COMPANY, as successor in interest to Durham Life Insurance Company, Group Administration Agency, Inc., and the United States Life Insurance Company in the City of New York,** Defendants.

Civil Action No. 97–1196 (WHW).

United States District Court, D. New Jersey.

Jan. 28, 1998.

---

Robert D. Chesler, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for Plaintiffs.

M. Paige Berry, Diane Bettino, Reed, Smith, Shaw & McClay, L.L.P., Princeton, NJ, for Defendant People's Security Life Insurance Company.

Richard M. Berman, Parker, McCay & Criscuolo, Cherry Hill, NJ, for Defendant Group Administration Agency, Inc.

Steven P. Del Mauro, Del Mauro & Associates, Morristown, NJ, for Defendant United States Life Insurance Company.

## OPINION

WALLS, District Judge.

This matter comes before the Court upon defendants' motion to dismiss counts three, six, seven, eight, nine and ten of plaintiffs' complaint. For the reasons that follow, defendants' motion is granted as to counts six, seven, eight, nine and ten. Defendant U.S. Life's motion to dismiss count three is also granted. As to all other defendants, the motion to dismiss count three is denied.

### Background

#### I. Parties

This action has been brought by Lisa Yourman on behalf of herself and her infant children Sarah and Jeffrey Yourman, and involves the offer and issuance of an insurance policy. That policy was issued by Durham Life Insurance Company (hereinafter "Durham"), represented here by defendant People's Security Life Insurance Company ("People's Security" or "People's") which became successor in interest to Durham when the two companies merged in September 1994. Defendant Group Administration Agency, Inc. ("Group Administration") processed and administered the policy, and defendant The United States Life Insurance Company in the City of New York ("U.S. Life") is present in this action because plaintiff alleges that as of November 1, 1993, U.S. Life assumed the policy from Durham subject to all of Durham's obligations.

#### II. Jurisdiction

This action was commenced in state court and removed by defendant People's Security pursuant to 28 U.S.C. § 1441. Plaintiffs are all residents of the State of New Jersey. Defendant People's Security is a North Carolina corporation with its principal place of business in Durham. Defendant Group Administration is an Illinois corporation, and defendant U.S. Life is a New York Corporation. Because the amount in controversy exceeds $75,000.00, the court has diversity jurisdiction over this matter under 28 U.S.C. § 1332.

#### III. Factual Background

This action arose from Durham's advertisement and later sale of an insurance policy of excess major medical insurance to Lisa Yourman in 1992. Offered through Hadassah, the Women's Zionist Organization of America, the policy was available, upon application, to Hadassah members, their spouses and dependant children. Under the terms of the policy, Durham would provide up to one million dollars of excess medical benefits following exhaustion of the policy deductible. Enrollees were offered a choice of two deductibles: $25,000 and $50,000.

Both Lisa Yourman and her infant child Sarah were members of Hadassah. In May 1992, Lisa Yourman submitted an enrollment application to Group Administration which listed Sarah as the primary insured. Later that month, Group Administration responded by letter that it would not forward the application to Durham because, as a minor, Sarah Yourman could only be insured as a dependant. The letter instructed Lisa Yourman to send a new application listing herself as the primary insured and Sarah Yourman as a dependant child. The complaint alleges that in a subsequent conversation with Group Administration, plaintiff revealed that Sarah Yourman suffered from cystic fibrosis.

In August 1992, plaintiff submitted another application which listed herself as the primary insured and Sarah as a dependant child. Upon receipt of this application, Group Administration advised plaintiff of a provision in the plan which states:

If the insured or covered dependant was totally disabled on the effective date, the effective date is deferred until such person is no longer totally disabled. "Totally disabled" means the inability of such person to engage in his gainful occupation, or, if such person except for such disability, is not regularly engaged in a gainful occupation, then the inability of such person to perform the normal duties of a person of like age and sex.

The letter advised that because Group Administration and Durham did not know the

extent to which Sarah Yourman's condition "affected her ability to function as a normal 2–year old," Durham would not approve the issuance of coverage for the child.

At Group Administration's direction, Lisa Yourman submitted a third enrollment form on November 2, 1992, again listing herself as the primary insured and Sarah Yourman as a dependant child. This application was accompanied by a doctor's letter which stated that Sarah Yourman suffered from a "mild form of cystic fibrosis," was, at present, "asymptomatic," and "leads the full, active and normal life of any 2 year old girl." Group Administration also received additional correspondence from another doctor which stated that despite her disease, "Sarah is able to function as a normal 2 year old and is able to participate in all age appropriate activities including normal play activities and normal school activities." Notwithstanding these letters, Durham continued, through December 1992, to refuse to issue a policy to Lisa Yourman and Sarah Yourman on the grounds that Sarah Yourman was "totally disabled" under the terms of the plan.

Plaintiff had numerous telephone conversations with representatives of both Durham and Group Administration in December 1992. In January 1993, Durham agreed to issue coverage on the condition that plaintiff accept a $50,000 deductible proviso. The company represented that its underwriting guidelines prevented it from issuing a policy with the $25,000 deductible. Plaintiff accepted Durham's terms but requested that the company honor the August or November enrollment forms. Durham agreed to do so upon plaintiff's submission of an original enrollment form dated November 2, 1992. As a result, coverage became effective as of December 1, 1992.

During the course of her negotiations with the defendants, Lisa Yourman had given birth to Jeffrey Yourman on December 21, 1992. Within three days of his birth, Jeffrey Yourman exhibited symptoms of cystic fibrosis. Plaintiff did not inform Group Administration of Jeffrey's birth until January 15, 1993, but because the policy had been deemed effective as of December 1, 1992,

Jeffrey Yourman became automatically covered as a dependant child upon his birth.

According to the complaint, Lisa Yourman has submitted claims totaling $30,226.81 to Durham and U.S. Life (which plaintiffs contend assumed ownership, as of November 1, 1993, of all policies underwritten by Durham in the state of New Jersey) on behalf of Jeffrey Yourman beginning shortly after his birth. Plaintiffs allege that because Sarah Yourman's medical expenses have never exceeded $50,000 during a relevant policy period, Lisa Yourman has never submitted a claim on Sarah Yourman's behalf. Plaintiffs complain that if the policy had been issued with the $25,000 deductible, a significant portion of Sarah Yourman's medical expenses would have been reimbursable and a more significant portion of Jeffrey Yourman's expenses would have been recovered.

In December 1995, plaintiffs filed a complaint with the New Jersey Department of Banking and Insurance questioning whether Durham's decision to issue coverage for Sarah Yourman only on the condition that plaintiffs accept a $50,000 deductible was consistent with Durham's internal underwriting guidelines. The department began an investigation of the matter and in its initial correspondence with People's Security—the successor in interest to Durham—the department investigator indicated his opinion that the plan at issue was a "guaranteed-issue" policy, and that as such, it entitled Lisa and Sarah Yourman to unconditional enrollment.

People's responded that it had exercised its rightful discretion in its handling of Lisa and Sarah Yourman's application. People's also claimed that it found plaintiff's behavior with regard to Jeffrey Yourman's enrollment "questionable." The letter stated that if the department would agree to abandon its investigation, People's Security would not seek reimbursement from plaintiffs for claims paid on behalf of Jeffrey Yourman, and would not pursue an action against Lisa Yourman with the Division of Insurance Fraud Prevention for misrepresentations on an application for health insurance.

The department informed plaintiffs of People's threat to pursue legal action against them and advised that because they had no

written agreement memorializing the content of the discussions Lisa Yourman had had with Durham and Group Administration, an adjudication on the understanding between the parties would necessarily hinge on findings of fact. The department declared that only a court of law had the authority to make such fact findings, and asked plaintiffs how they wished to proceed. This action followed.

### Analysis

A federal court sitting in diversity is obliged to apply state substantive law as decided by the highest court of the state whose law governs the action. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Commercial Union Ins. Co. v. Bituminous Cas. Corp.,* 851 F.2d 98, 100 (3d Cir.1988).

### I. Plaintiffs' Consumer Fraud Act Claim

Count three of the complaint asserts that Group Administration and People's, as successor to Durham, violated the New Jersey Consumer Fraud Act, ("CFA"). N.J.S.A. 56:8–1, *et seq.,* by advertising the Hadassah Plan as a guaranteed-issue policy and then refusing to insure Sarah and Jeffrey Yourman at the $25,000 deductible rate. Defendants seek dismissal of this claim on the grounds that the CFA does not apply to the insurance industry. Because the Court finds that the CFA does apply to the sale and marketing of insurance policies, defendant's motion is denied.

The CFA is a broad consumer protection measure enacted to "eliminat[e] sharp practices and dealings in the marketing of merchandise and real estate." *Channel Cos. v. Britton,* 167 N.J.Super. 417, 418, 400 A.2d 1221 (App.Div.1979). As such, it prohibits

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing [ ] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid,

whether or not any person has in fact been mislead, deceived or damaged thereby. . . .

N.J.S.A. 56:8–2.

The statute defines "merchandise" to be "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8–1(c). "Advertisement" is

the attempt directly or indirectly by publication . . . solicitation . . . or circulation or in any other way to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof. . . .

N.J.S.A. 56:8–1(a).

Despite these broad definitions and the clear legislative intent that the CFA be applied broadly to root out consumer fraud, *see, e.g., Barry v. Arrow Pontiac,* 100 N.J. 57, 69, 494 A.2d 804 (1985), at the time the parties filed their papers on this motion, there had been no clear statement from the New Jersey Supreme Court on whether the statute would apply to the fraudulent marketing of insurance policies. *See Rodio v. Smith,* 123 N.J. 345, 587 A.2d 621 (1991) (explicitly declining to rule on whether the statute applied to the insurance industry.) Guidance from the lower courts was similarly limited. For example, in *Pierzga v. Ohio Cas. Group of Ins. Cos.,* 208 N.J.Super. 40, 504 A.2d 1200 (App.Div.1986), *cert. denied,* 104 N.J. 399, 517 A.2d 402 (1986), the Appellate Division declined to apply the CFA to an insurance company's refusal to pay a claim under a policy it had issued, but the opinion in that case is both too broad and too narrow to be of substantial value to the situation at bar. On one hand, the *Pierzga* court explicitly refused to allow a cause of action under the CFA, noting that "the Legislature has [already] provided an administrative remedy under the Insurance Trade Practices Act, ('ITPA'), N.J.S.A. 17:29B–1 *et seq.,* for unfair claims settlement practices." *Id.* at 45, 504 A.2d 1200. The court reasoned that application of the CFA was inappropriate because to permit a second avenue of regulation "could result in conflicting rulings." *Id.* at 47, 504 A.2d 1200; *Cf. Daaleman v. Elizabethtown*

*Gas Co.*, 77 N.J. 267, 272, 390 A.2d 566 (1978) (New Jersey Supreme Court, under same reasoning, refused to apply the CFA to the rate setting of utility company). But on the other hand, the *Pierzga* court also explicitly noted that the facts of that case did "not involve a case of a consumer being victimized by unscrupulous or fraudulent marketing practices." *Id.*

Not surprisingly, defendants' papers selectively focus on the former point, noting that the Insurance Trade Practices Act[1] ("ITPA"), N.J.S.A. 17B:30–1 *et seq.*, which contains provisions specifically prohibiting misrepresentations in advertisements of insurance policies, should preclude the application of the more general CFA. According to defendants, jurisdiction over plaintiffs' fraud claim lies solely in the hands of the Commissioner of Banking and Insurance. In response, plaintiffs have, of course, seized the limiting language of *Pierzga*, and strive to distinguish that case factually. In the absence of any real precedent on the matter, this Court found itself in the uncomfortable position of having to prophesy how the state Supreme Court would rule if presented with this issue.

Then, like a true good buddy who anticipates your needs before you can even articulate them, just days after the papers were filed in this matter, the New Jersey Supreme Court decided *Lemelledo v. Beneficial Management Corp. of America*, 150 N.J. 255, 696 A.2d 546 (1997) and resolved the present issues squarely and unambiguously.

In *Lemelledo*, the plaintiff had applied for a $2,000 loan from Beneficial. When she went to defendant's office to pick up the check, to her surprise she was presented with a loan contract for $2538.47 and a check for $2,203.19. While it is unclear why she received $203.19 more than she had applied for, the $335.28 difference between the amount in the contract and the amount Lemelledo received was earmarked for credit insurance premiums to cover the possibility hat she would default on her loan repayment.

Beneficial had provided a form noting that the insurance was not a prerequisite to obtaining credit, but the company's actions led Lemelledo to believe that she would not receive the loan if she did not purchase the insurance. Beneficial presented the insurance and the loan agreements in a single contract with one lump sum. It did not advise Lemelledo as to whether the insurance was appropriate for her, and never discussed the insurance apart from the loan. Moreover. Lemelledo felt pressured to take the insurance because, had she declined, she would have had to return at a later date to receive the reprocessed loan proceeds. These tactics were particularly effective because Lemelledo was of limited financial means and therefore did not have many available sources of credit. Lemelledo repaid the loan but not the entire balance due on the insurance premiums. She then brought an action against Beneficial, asserting, *inter alia*, violations of the Consumer Fraud Act.

The Supreme Court began its analysis by finding that "although several lower courts have held that the payment of insurance *benefits* is not subject to the CFA, our reading of the CFA convinces us that the statute's language is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers." 150 N.J. at 265, 696 A.2d 546 (emphasis in original) (internal citations omitted). Then, as if tracking the arguments presented in this case, the *Lemelledo* Court addressed the issue of multiple regulation.

The Supreme Court held that "*Daaleman* ... does not stand for the bright-line proposition that a regulated practice is automatically covered by the CFA or automatically exempt from it based solely on the number of administrative agencies having regulatory jurisdiction over the practice." *Id.* at 267, 390 A.2d 566. The Court observed that the

---

1. There seems to be some confusion as to the popular name of this statute. Defendants have referred to it as the Unfair Claim Settlement Practices Act ("UCSPA"), and the Court has found reference to this name. However, several other sources, including the New Jersey Supreme Court and the Commissioner of Insurance use ITPA. The Court will therefore refer to the statute as the ITPA.

CFA was specifically drafted to be cumulative to other legal remedies, N.J.S.A. 56:8–2.13, and that the statute, by providing for private causes of action, "contemplates that consumers will act as 'private attorneys general.'" *Id.* at 268, 390 A.2d 566. This, the Court concluded, reflects a specific "legislative intent to enlarge fraud-fighting authority and to delegate that authority among various governmental entities." *Id.* at 269, 390 A.2d 566. *Lemelledo* thus requires that courts "assume[ ] that the CFA applies to the covered practice," *id.* at 268, 696 A.2d 546, and then consider the implications of multiple regulation by examining "whether a 'real possibility' of conflict would exist if the CFA were to apply to a particular practice." *Id.*

In *Lemelledo,* the defendant insurer argued that the ITPA, the Insurance Producer Licensing Act ("IPLA"), N.J.S.A. 17:22A–1 *et seq.,* and the Credit Life and Health Insurance Act ("CLHIA"), N.J.S.A. 17B:29–1 *et seq.* subjected it to substantial regulation by the Department of Banking and Insurance, and that additional regulation by the Division of Consumer Affairs and private civil actions would give rise to a "real possibility of conflict." The Court disagreed, however, and found instead that the CFA, with its shared legislative purpose, "simply complements those statutes, allowing for regulation by the Division of Consumer Affairs and a private cause of action to recover damages." *Id.* at 273, 696 A.2d 546.

The Supreme Court therefore concluded that the CFA can be applied without conflict, even in the face of other legislation such as the ITPA,

> if courts are cognizant of the obligations created by other statutes and if they interpret the scope of the broad language of the CFA so as not to impose conflicting duties or duplicative financial obligations on the regulated party.... Should the broad application of the CFA implicate the jurisdiction of more than one agency, those agencies should utilize that framework to resolve the conflict in an orderly or efficient manner.... [I]n the vast majority of cases, it will [likely] be clear which of the agencies has primary jurisdiction. Once the other agency defers and the primary

agency takes action, the deferring agency can take future action as may be necessary or appropriate to award any additional or complimentary relief.

*Id.* at 273–74, 696 A.2d 546.

This is exactly what has happened here. Apparently because it felt it lacked the fact-finding jurisdiction of the courts, the Department of Banking and Insurance, despite its initial finding that "it seems that Mrs. Yourman's concerns are valid," suggested that the Yourman's pursue their action in this forum. Thus, we have a situation to which *Lemelledo's* thoughtful policy analysis directly applies. The Yourmans have alleged consumer fraud in the sale and advertisement of an insurance policy. This is an allegation which falls directly within the broad legislative purview of the CFA. Moreover, although empowered to address this issue, the Department of Banking and Insurance has, for its own reasons, recommended that the resolution of this matter be addressed by other properly empowered entities. The Yourmans have therefore become private attorneys general and present their case to the Court. And there is now direct precedent ordaining that the CFA can and should apply to the sale and advertisement of insurance. The Court is confident that it can apply the CFA without imposing conflicting duties or duplicative obligations on the insurance industry.

Because plaintiffs have alleged that Durham and Group Administration employed deception in the advertisement and sale of goods and services covered by the CFA, the motion to dismiss this count of the complaint by those defendants is denied. However, because the complaint (1) makes no such allegations as to defendant U.S. Life, and (2) does not allege that U.S. Life assumed Durham's liabilities in tort—particularly those of intentional torts—when it assumed Durham's contractual obligations, this count of the complaint is dismissed as to U.S. Life.

## II. Plaintiffs' Claim Under The New Jersey Law Against Discrimination

■ In counts eight, nine and ten of the complaint, plaintiffs charge that Durham's refusal to provide insurance to Sarah and

Jeffrey Yourman because each suffers from cystic fibrosis constitutes unlawful discrimination on the basis of a handicap in violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5–1 *et seq.* Defendants respond that the LAD is inapplicable to the terms of insurance plans or policies in this context. Because the Court finds that application of the LAD would subject the insurance industry to the type of multiple regulation that would result in "real conflict," defendants' motion to dismiss these counts is granted.

The LAD was enacted "to provide the handicapped full and equal access to society...." *D.I.A.L. v. N.J. Dep't of Community Affairs,* 254 N.J.Super. 426, 439, 603 A.2d 967 (App.Div.1992). In pursuit of this goal, the statute makes it unlawful "[f]or any person to refuse to buy from, sell to, lease from or to, license, contract with, or trade with, provide goods, services or information to, or otherwise do business with any other person," N.J.S.A. 10:5–12l, "because such person is or has been at any time handicapped...." N.J.S.A. 10:5–4.1. The New Jersey Supreme Court has admonished that the LAD "should be construed 'with that high degree of liberality which comports with the preeminent social significance of its purposes and objects.'"*Andersen v. Exxon Co.,* 89 N.J. 483, 495, 446 A.2d 486 (1982) (citation omitted).

Defendants contend that by its express terms, the LAD does not apply to insurance programs. They note that Section 10:5–2.1 of the act provides:

> Nothing contained in this act ... shall be construed to ... interfere with the operation of the terms or conditions and administration of any bona fide retirement, pension, employee benefit or insurance plan or program....

Plaintiffs respond that this "safe harbor" provision must be construed narrowly in the context of its specific language. They note that "retirement," "pension" and "employee benefit" programs all relate to a person's employment. Because "insurance" is often part of the same package of benefits as the other three, it follows, according to plaintiff's argument, that the statute must be read as excluding only employee insurance programs.

Both logic and linguistics support plaintiffs' reading of this provision, and, indeed, this interpretation has been alluded to by both the Third Circuit and other courts in this district. *See Zinger v. Blanchette,* 549 F.2d 901, 907 (3d Cir.1977), *cert. denied,* 434 U.S. 1008 (1978) (comparing the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.,* to the portion of Section 10:5–2.1 here at issue); *Nolan v. Otis Elevator Co.,* 560 F.Supp. 119, 121 (D.N.J.1982) (discussing this section in an employment context). Nevertheless, this Court need not resolve this issue because application of the LAD as suggested by plaintiff would have substantial legal and policy consequences that this Court will not impose.

Plaintiffs do not allege that Durham declined to issue coverage on the basis of plaintiffs' handicap. Rather, they simply assert that Durham protected itself from the higher risk of insuring Sarah Yourman by offering coverage with a deductible less favorable than that offered to persons not suffering from cystic fibrosis. In effect, this condition was similar to charging plaintiffs a higher premium for the coverage.

The business of insurance and the mechanics of insurance regulation both strive to strike a balance between two competing goals. "On the one hand, if two purchasers of insurance coverage have different predicted losses or actual loss experiences, it is easy to conclude that the prices that each pay should reflect those differences. On the other hand, insurance may also be viewed as a method of risk sharing in which a group of insureds collectively bears the risk that a group member will suffer a loss." Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification,* 71 Va.L.Rev 403, 403 (1985). Obviously, efficiency is promoted when risks are effectively classified and policyholders are charged different premiums or offered different deductibles according to their expected loss. It is indeed on this basis that the insurance industry largely operates—leveraging these efficiency gains in order to compete with protection alternatives such as self-insurance. *See id.* at 407 ("through classification, [insurers] can offer low-risk individuals lower prices"). The

Court, of course, recognizes that there may be instances in which social policy or politics dictate that certain risks be home evenly by an entire class of insureds. However, decisions on which risks, if any, merit such treatment and how to distribute the costs of those risks are the provence of the legislature—not the judiciary.

Insurance rates and the regulation thereof, are, as is well known, the topic of much legal, social and political debate, and New Jersey has an extensive legislative infrastructure governing the establishment of insurance rates. For example, N.J.S.A. 17:29A–4 mandates that:

> . . . every insurer which makes its own rates, shall make rates that are not unreasonably high or inadequate for the safety and soundness of the insurer, and which do not unfairly discriminate between risks in this State involving essentially the same hazards . . .

Insurers must file proposed rates with the Commissioner of Insurance, N.J.S.A. 17:29A–6, who must approve of the rates only if he finds

> that such rating systems provide for, result in, or produce rates that are not unreasonably high, and are not inadequate for the safeness and soundness of the insurer, and are not unfairly discriminatory between risks in this State involving essentially the same hazards and expense elements. . . .

N.J.S.A. 17:29A–7.

Similarly, N.J.S.A. 29B–4(7)(b) defines as "unfair discrimination":

> Making or permitting any unfair discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of . . . health insurance. . . .

Two crucial facts are borne out by these and other provisions. The first is a that the New Jersey state legislature has addressed the issue of discrimination in insurance and has expressly disallowed discrimination only between those risks involving *essentially the same hazards*. The second and more fundamental point is that the process of evaluating and establishing insurance premiums and other means of discriminating between risks is complex and nuanced, and its oversight properly lies with the Commissioner, subject to the statutory requirements.

Plaintiffs contend that for the purposes of offering coverage at a particular rate, proper liberal construction of the LAD necessitates that insurance companies treat people with cystic fibrosis or any other handicap no differently from people not similarly disabled. But a construction so expansive would improperly distort the industry and the state legislated system of insurance regulation.

To accept plaintiff's LAD argument would place the Court in exactly the situation about which *Lemelledo, supra,* warns. The setting of insurance rates is regulated by the Commissioner of Insurance pursuant to statute. And the New Jersey Supreme Court has recognized a link between deductibles and premium rates. *State Farm Mutual Automobile Ins. Co. v. State Dep't of the Public Advocate,* 118 N.J. 336, 356, 571 A.2d 957 (1990) ("changes in deductibles would usually have the effect of raising rates"). Thus, if the Court were to rule now that the LAD applies in this context, the result would be that risk classification according to such basic and long accepted criteria as the age and the relative health of the insured would be abolished. Given the clear societal, statutory and regulatory tolerance for such classifications, the Court can think of few situations where an additional form of regulation would so clearly lead to the "real possibility of conflict." Because the Court finds no indication from the New Jersey state legislature or state supreme court that such an application of the LAD is appropriate, the Court finds the statute inapplicable and grants defendants' motion to dismiss counts eight, nine and ten.

### III. Plaintiffs' Claim of Intentional Infliction of Emotional Distress

In count six of the complaint, plaintiffs assert that Durham and Group Administration, by their initial denial of coverage for Sarah Yourman and their subsequent refusal to insure her at the $25,000 deductible rate, intentionally inflicted emotional distress on Lisa Yourman or recklessly acted in deliber-

ate disregard of a high probability that Lisa Yourman would suffer emotional distress as a result of their actions. Plaintiffs also contend that Durham's threat to bring an action against plaintiffs before the Division of Insurance Fraud Prevention when it knowingly lacked a factual or legal basis for doing so inflicted further emotional distress on Lisa Yourman. Because plaintiffs have failed to sufficiently plead all of the elements of their claim, this count of the complaint is dismissed.

New Jersey courts follow the definition of the Restatement (2d) of Torts, § 46 (1965) for intentional infliction of emotional distress:

Generally speaking ... the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.

Second, the defendant's conduct must be extreme and outrageous. The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress. Fourth, the emotional distress suffered by the plaintiff must be so severe that no reasonable man could be expected to endure it.

*Buckley v. Trenton Saving Fund Society,* 111 N.J. 355, 363, 544 A.2d 857 (1988) (citations omitted). Plaintiffs allegations do not meet these requirements.

First, accepting, as we do, plaintiffs allegations to be true, defendants refusal to issue the policy at the $25,000 deductible base, even with knowledge of Lisa Yourman's dire financial need, simply cannot be construed as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possi-

ble bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Perhaps the course of action was wrong. Perhaps, as plaintiffs claim, this behavior constituted breach of a contract between the parties, was fraudulent, or amounted to a breach of the duty of good faith and fair dealing. If so, plaintiffs shall have an opportunity to prove as much in court. However, insurance companies regularly deny coverage or place conditions on its issuance in situations similar to this one. For the Court to find that such behavior is at all times "beyond all possible bounds of decency ... and utterly intolerable in a civilized community," would, to put it mildly, be hyperbole.

■ Nor can People's subsequent threat to pursue legal action be defined in terms so harsh. The complaint admits that when Jeffrey Yourman was born, plaintiffs did not inform Durham of his illness but expected that the policy would automatically cover him. People's Security apparently disagreed with the propriety of plaintiffs' assessment and actions, and threatened to act accordingly. The Court understands that the thought of having to defend a legal action can be the cause of stress and consternation. However, resort to the legal system for the resolution of such disputes, while perhaps too common an occurrence, nevertheless remains one of the essentials of a civilized community. If People's claims were without merit, plaintiffs would have had an opportunity to vindicate themselves in the appropriate judicial forum. This Court cannot agree that People's threat, without more, constituted "extreme and outrageous" conduct.

■ In addition, the complaint fails to allege the requisite harm to support the claim. In *Buckley,* the court focused on three factors in applying the severity test: (1) the frequency of the distress; (2) the length or intensity of the distress; and (3) the interference caused by the distress in everyday life. *Id.* at 368–69, 544 A.2d 857. Here, plaintiffs merely state that Lisa Yourman "suffer[ed] severe emotional distress concerning the financial solvency of her family, the availability of funds for the treatment of Sarah Your-

man's and Jeffrey Yourman's chronic condition, as well as fear of legal reprisals by the Division of Insurance Fraud Prevention." While clearly unfortunate, this is not the type of distress that no reasonable person could be expected to endure. Moreover, nowhere does the complaint allege that Lisa Yourman's distress is "continual, frequent, [or] profound." *Cf. Phillips v. Cooper OB/GYN Assocs.*, 811 F.Supp. 1018, 1025 (D.N.J.1992).

Defendants' motion to dismiss count six of the complaint is therefore granted.

## IV. Plaintiffs' Defamation Claim

■ Count seven of the complaint charges that in the August 15, 1996 letter to the Department of Insurance, Durham falsely accused Lisa Yourman of making intentional misrepresentations on her application for insurance. Plaintiffs contend that Durham knew that these statements were false when it communicated them, or made the statements in reckless disregard of the truth. The Court finds that because the statements in question were statements of opinion premised on disclosed facts, they were, as a matter of law, not defamatory. The Court also finds that given the circumstances surrounding the statements, they were protected by absolute privilege. Defendant's motion to dismiss this count is therefore granted.

In the complaint, plaintiffs admit (1) that Jeffrey Yourman was born on December 21, 1992 and exhibited symptoms of cystic fibrosis within three days of his birth; (2) that Durham, after several months of negotiations with plaintiffs, finally agreed to issue coverage to Lisa and Sarah Yourman with a $50,000 deductible on January 4, 1993; (3) that thereafter, Lisa Yourman requested that Durham and Group Administration honor the August or November enrollment form; (4) that Defendants agreed to do so upon Lisa Yourman's submission of an original enrollment form dated November 2, 1992; (5) that because Durham, in January 1993, accepted an application with a November 2 1992 date, coverage became effective as of December 1, 1992 and extended to Jeffrey Yourman automatically, and (6) that Lisa Yourman had not informed Group Administration of Jeffrey's

birth until approximately January 15, 1993—after the coverage dispute had been settled.

Plaintiffs complain that when they initiated proceedings against defendants with the Department of Banking and Insurance, defendants answered by defaming plaintiffs in a letter to the Department dated August 15, 1996. Specifically, plaintiffs take issue with the following language of the letter:

... there are certainly questions concerning Ms. Yourman's request to back date the application without advising Durham Life that she had already given birth to a second child born with cystic fibrosis. Durham Life has paid substantial monies on behalf of Ms. Yourman's second child notwithstanding the questionable behavior of Ms. Yourman in the request to back date coverage and in the omission on the application of insurance off her second child.

\*   \*   \*   \*   \*   \*

In exchange for the Department agreeing not to pursue this matter further, Durham Life will:

1. Not seek reimbursement from Lisa Yourman and her family on claims paid on Jeffrey in the amount of $30,226.81.
2. Not pursue action against Lisa Yourman with the Division of Insurance Fraud Prevention for misrepresentations on an application for health insurance.

\*   \*   \*   \*   \*   \*

It is Lisa Yourman and her family who have not acted in good faith in the manner in which they pursued the issuance of coverage and now in the manner in which they contend that the assignment of a $50,000 deductible was inappropriate.

Plaintiffs argue that "[t]aken together, these statements constituted an accusation by People's Security that, in order to secure coverage for Jeffrey under the policy, Lisa Yourman had intentionally concealed and misrepresented the dates of Jeffrey's birth and medical condition, while simultaneously insisting that the policy's effective date be 'back dated.' Bluntly, People's accused Lisa Yourman of committing insurance fraud...."

This, according to plaintiffs, constituted actionable defamation.

Plaintiffs' indignation is misplaced and their characterization of the law inaccurate. Durham's comments were a fair representation of its position with regard to plaintiffs' actions. As such, they could not constitute defamation. Moreover, the context of the communication cloaked the statements with absolute privilege.

According to the United States Supreme Court, "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Gertz v. Welch*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Refining those thoughts, the New Jersey Supreme Court, in *Kotlikoff v. Community News*, 89 N.J. 62, 444 A.2d 1086 (1982), wrote that expression of "opinion" can take one of two forms.

> The first, or "pure," kind is found when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then states a view as to the plaintiff's conduct ... "Pure" expression of opinion occurs also when the maker of the comment does not spell out the alleged facts on which the opinion is based but both parties to the communication know the facts or assume their existence and the statement of opinion is obviously based on those assumed facts as justification for the opinion. The second, or "mixed" type of expression is one that, while an opinion in form or context, is apparently based on facts about the plaintiff or his conduct that have neither been stated by the defendant nor assumed to exist by the parties to the communication.

*Id.* at 68–69, 444 A.2d 1086.

Thus, the Court determined that a "mixed" expression can be defamatory if the statement implies underlying objective facts that are false. But with "pure" expressions of opinion, "[w]here an opinion is accompanied by its underlying factual basis ... a defamation action premised upon the opinion will fail, no matter how unjustified, unreasonable or derogatory the opinion might be. This is so because readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified." *Id.* at 73, 444 A.2d 1086.

Here, plaintiffs have challenged a "pure" expression of opinion. Plaintiff does not contend that the facts underlying the challenged inferences were not known to the Department—indeed, the letter makes clear that these actions were the subject of a prior communication between Durham and the Department. Nor can plaintiffs contest the truth of these underlying facts, as the assumptions upon which the letter is based do not contradict the facts of the complaint. Durham apparently concluded that plaintiffs failure to inform the company of Jeffrey's birth until after the company had acquiesced in providing coverage constituted an actionable misrepresentation. This was a "pure" opinion based upon facts known to both parties to the communication. *Cf. Avins v. White*, 627 F.2d 637 (3d. Cir.1980), *cert. denied*, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (disparaging remarks in official report of law school accreditation team found to be pure opinion as a matter of law).

Similarly, although plaintiffs do not appreciate Durham's characterization of their actions as a demand to "back date" the policy, they nevertheless admit that they convinced Durham to accept an application in January of 1993 that was dated November 2, 1992. "Back dating," is not an inaccurate description of what occurred. Consequently, any allegations of misrepresentation and fraud in Durham's letter are protected expressions of opinion based upon undisputed fact. If Durham had implied that an appropriate tribunal had actually found fraud by plaintiffs, the Court's conclusion would be different. Here, however, Durham's expressions contained no such misrepresentations. They were expressions of opinion which signaled the company's negotiating position on the matter.

█ In addition, because defendants made these statements in the context of a quasi-judicial proceeding, the communication was protected by absolute privilege. The complaint admits that when Lisa Yourman filed a

complaint against Durham with the Department of Insurance in December 1995, an investigation was triggered pursuant to the ITPA. *See* N.J.S.A. 17B:30–16. Under the statute, "[i]f the commissioner has reason to believe that any person has been engaged or is engaging in any unfair method of competition, or any unfair or deceptive act or practice expressly prohibited in this chapter, and that a proceeding thereto would be in the interest of the public, he shall issue and serve upon such person a statement of the charges in that respect and a notice of a hearing thereon ..." N.J.S.A. 17B:30–17. The subject letter was sent in response to this investigation and is therefore privileged as are all communications in a quasi-judicial proceeding.

In *Rainier's Dairies v. Raritan Valley Farms,* 19 N.J. 552, 117 A.2d 889 (1955), defendant Raritan Valley Farms (Raritan) filed a petition with the Director of Milk Industry accusing the plaintiff Rainier's Dairies of having violated regulations of the Office of Milk Industry. After a hearing in which Raritan's charges were dismissed for failure to meet the appropriate burden of proof, plaintiff sued for libel. The New Jersey Supreme Court found that the Director's hearing was a quasi-judicial proceeding and that as such, any statements made within the framework of that undertaking were protected by absolute privilege. In particular, the Court noted that

> there [was] no question that the Director had at least colorable jurisdiction to entertain and determine the proceedings initiated by Raritan.... He was empowered to fix prices, promulgate rules and regulations, and investigate alleged violations thereof. He was likewise empowered to hold informal hearings on violations and to conduct formal hearings on the basis of which he might decline to issue licenses or suspend or revoke existing licenses.

*Id.* at 559, 117 A.2d at 892. These powers are very similar to those given to the Commissioner of Insurance by the ITPA.

It is true, as plaintiffs point out, that the Court in *Rainier* was impressed that an "administrative proceeding was *actually conducted* in manner and with safeguards

similar to a judicial proceeding...." 19 N.J. at 562, 117 A.2d 889, (emphasis added). Plaintiffs attempt to distinguish their case from *Rainier,* asserting that here, "[t]he department did nothing more than exchange correspondence with People's. No hearing occurred; no witnesses were sworn; no testimony was taken." But notwithstanding that the process did not progress that far, such a hearing was the ultimate goal when plaintiffs filed their complaint with the Department. Indeed, plaintiffs themselves made the decision to terminate the Department's proceedings and instead seek redress in this Court. It is therefore somewhat disingenuous for them to contend that the administrative proceeding is robbed of its quasi-judicial nature simply because it got only as far as the investigative stage. Clearly the prologue is part of the play.

Defendant's motion to dismiss count seven of the complaint is therefore granted.

### Conclusion

For the foregoing reasons, counts six, seven, eight, nine and ten of the complaint are dismissed and the motion to dismiss count three is denied.

### ORDER

This matter comes before the Court upon defendants' motion for an order of judgment on the pleadings dismissing counts three, six, seven, eight, nine and ten of plaintiffs' complaint.

Upon review of the submissions of the parties and for good cause shown, it is on this 28th day of January, 1998,

*Ordered* that defendants' motion to dismiss counts six, seven, eight, nine and ten of the complaint is ***granted:***

It is ***Further Ordered*** that defendant U.S. Life's motion to dismiss count three of the complaint is ***granted;***

It is ***Further Ordered*** that the remaining motions to dismiss count three of the complaint are ***denied.***